[Civ. No. 36707. Second Dist., Div. Two. June 24, 1971.]

BARRY BLEECK, Plaintiff and Respondent, v.
STATE BOARD OF OPTOMETRY et al., Defendants and Appellants.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Alvin J. Korobkin, Deputy Attorney General, for Defendants and Appellants.

Gitelson, Katz, Hoyt & Blum and Philip M. Rosten for Plaintiff and Respondent.

## OPINION

**HERNDON, J.**—Appellants are the State Board of Optometry, generally referred to herein as the "Board," its individual members and its executive secretary. Respondent is an optometrist duly licensed to practice his profession in the State of California. On and prior to October 1, 1959, respondent was licensed to operate some 36 branch offices.

### Statement of the Case

The judgment from which this appeal is taken orders the issuance of a writ of mandate by the terms of which the Board is directed within the time specified therein to transfer each of 29 "inactive" branch office licenses for the practice of optometry from their former locations to such other location or locations within the State of California as respondent may from time to time designate in writing to the Board.

Appellants' primary assignment of error is that the trial court erroneously applied the doctrines of res judicata and collateral estoppel in holding that the final judgment in favor of respondent in a prior action constituted such an adjudication of the issues tendered in the instant action as to bar the introduction of any evidence offered by appellants to prove that respondent had abandoned the branch offices involved in this proceeding within the meaning of *Rich* v. *State Board of Optometry,* 242 Cal.App.2d 598 [51 Cal.Rptr. 674]. Appellants advance the further contentions that respondent's action is barred by the statute of limitations and that the judgment must be reversed because of respondent's failure to exhaust his administrative remedies before seeking judicial review.

To make more readily understandable our later recital of the facts, we shall first briefly summarize the development of the California law governing the rights of an optometrist to maintain and operate branch offices and the conditions under which licenses to operate such branch offices may be transferred from one location to another.

Section 3077 of the Business and Professions Code enacted in 1955 established the requirement that after January 1, 1957, an optometrist must obtain from the Board a branch office license for each branch office which he operated. As originally enacted the statute contained no restriction on the number of branch offices or branch office licenses available to an optometrist.

In 1959, section 3077 was amended so as to restrict the number of branch offices available to an optometrist by providing that "[o]n or after October 1, 1959, no more than one branch office license shall be issued to any optometrist or to any two or more optometrists, jointly."

However, a so-called "grandfather clause" was incorporated into the statute by the provisions of subdivision (i) of section 3077 reading as follows: "Nothing in this chapter shall limit or authorize the board to limit the number of branch offices which are in operation on October 1, 1959 and which conform to the provisions of this chapter, nor prevent an optometrist from acquiring any branch office or offices of his parent. The sale after October 1, 1959 of any branch office shall terminate the privilege of operating such branch office and no new branch office license shall be issued in place of the license issued for such branch office, unless the branch office is the only one operated by the optometrist or two or more optometrists jointly.

"Nothing in this chapter shall prevent an optometrist from owning, maintaining or operating more than one branch office if he is in personal attendance at each of his offices fifty per cent (50%) of the time during which such office is open for the practice of optometry."

Following the 1959 amendment to section 3077, the Board requested the opinion of the Attorney General of California "as to whether branch office licenses are transferable at the request of the licensee to a new location." Under date of December 10, 1959, the Attorney General issued Opinion No. 59/312, the conclusion of which is summarized as follows:

"Branch office licenses issued to registered optometrists are not transferable to a new location. Relocation of a branch office can be accomplished only by surrender of the old license, making proper application for a new branch office license to be issued to the new location, and satisfying the State Board of Optometry that issuance of the new branch office license will not violate the present terms of the act limiting the number of branch offices available to optometrists."

In July of 1965, the decision in Rich v. *State Board of Optometry*, 235 Cal.App.2d 591 [45 Cal.Rptr. 512], was filed. That case is sometimes re-

ferred to hereinafter as "the first *Rich* case." It involved the appeal of the State Board of Optometry from the judgments of the trial court granting the respondents Rich and Oakley writs of mandate to compel the Board to issue new branch office licenses as sought by the respondents for licensed branch offices which they proposed to move to different locations.

In affirming the judgments, the Court of Appeal discussed at length the meaning and effect of the grandfather clause of section 3077 and commented that "[T]he 1959 amendments to section 3077 were apparently added for the purpose of making the practice of optometry less commercial and more professional, 'to insure an adequate measure of personal performance and supervision in keeping with the nature of the service and the avoidance of the evils of competition which has its place in trade and mercantile pursuits but not in the practice of this profession.' [Citation.]" (At pp. 604-605.)

After a further detailed discussion of the language of the statute, the Court of Appeal concluded (p. 607): "Accordingly, in spite of the policy considerations involved in the instant case, we are of the opinion that subdivision (i) of section 3077, as properly construed, affords protection to optometrists operating branch offices on October 1, 1959 and that, *in the absence of the sale of the business operated at a branch office location, optometrists are entitled to continue to maintain and operate as many branch offices as they operated on October 1, 1959.*" (Italics added.)

Approximately 11 months later, on June 1, 1966, the decision in the second *Rich* case was filed, *Rich* v. *State Board of Optometry,* 242 Cal.App.2d 598 [51 Cal.Rptr. 674]. In this case the appellant Rich applied to the Board in 1963 for licenses for three relocated branch offices which had been closed and discontinued in 1960. The trial court upheld the Board's refusal to reissue branch office licenses for the discontinued offices. The Court of Appeal affirmed the judgment, stating as follows at page 603: "The crucial difference between the facts of the instant case and those of the prior *Rich* case is that there the petitioners sought to transfer branch office licenses for two of their *existing* branch offices. In holding that they were entitled to such relief, we stated that 'optometrists are entitled to *continue to maintain and operate* as many branch offices as they operated on October 1, 1959.' (Italics added; p. 607; see also p. 608.) In the instant case, on the other hand, although Rich operated 13 branch offices as of October 1, 1959, he subsequently discontinued his practice at three of these locations and surrendered his branch office licenses for these three locations to the Board. He is thus not seeking to continue operation of these three branch offices but rather to start anew three branch office practices in the place of the three practices which he abandoned in 1960.

"As we read subdivision (i) of section 3077 it allows an optometrist to *continue to maintain* the same number of branch offices which he operated as of October 1, 1959, without regard for the fact that this number may be in excess of the number currently allowed by section 3077. The 'grandfather clause' protection exists, however, only so long as the optometrist *continues to maintain* this same number of branch offices. Once he ceases doing business at one of his branch offices, without transferring his practice to another location, he loses the protection afforded by the 'grandfather clause' of section 3077. Moreover, we think that this interpretation of section 3077 is fortified by the purpose of the 'grandfather clause,' which, as stated in *Golden Gate Scenic Steamship Lines, Inc.* v. *Public Utilities Com.,* 57 Cal.2d 373, 379 [19 Cal.Rptr. 657, 369 P.2d 257], is 'to give those engaged in a business being brought under regulation the right to continue their existing business without being subjected to certification requirements that would be applicable if the business were then being started for the first time.' (See also *Harris* v. *Alcoholic Beverage etc. Appeals Board,* 61 Cal.2d 305 [38 Cal.Rptr. 409, 392 P.2d 1].) Such a purpose clearly does not extend to a situation like that involved in the instant case where Rich, by virtue of closing three of his branch offices, no longer possesses the vested existing interest or competitive advantage which the 'grandfather clause' seeks to protect."

### Statement of Facts

On or prior to October 1, 1959, respondent Bleeck held licenses for each of the 29 branch offices involved herein. On a number of occasions after January 1, 1960, respondent wrote letters to the Board indicating his intention to close various of these branch offices either because of the expiration of leases or because offices at others of the specified locations had proved financially unsuccessful due to changing operating conditions.

In certain of these letters respondent indicated his recognition that it was the position of the Board that branch office licenses could not be transferred to new locations but stated that he had been advised by his attorney that in his opinion branch offices could be moved and that the Board was obligated to issue new licenses for the new locations. He further stated that in view of the serious legal question as to his rights, it was his purpose to *"keep said offices inactive until such time as this question has been resolved in the manner provided by law."* In certain of these letters respondent further stated, "I am not abandoning these branch offices, and this letter is not in any way to be construed as a waiver or relinquishment of my right to move the offices to new locations when and if it has been determined that I have the right to do so."

In responding to one of the first of these letters the Board enclosed a copy of the opinion of the Attorney General stating the above quoted conclusion that branch office licenses were not transferable from one location to another. The Board further advised respondent as follows:

"Abandonment of any of your branch offices is within your discretion. However, if you abandon a branch office, the branch office license issued to you for that office must be surrendered to the Board. The surrender of a branch office license issued for a branch office which is abandoned does not imply or infer a right to be granted a branch office license for a different office."

During the year 1960, respondent closed 19 of his branch offices and during the year 1961 he closed 6 other offices. In January of 1964, two other offices were closed. In each instance respondent addressed a letter to the Board stating that he was closing the described office or offices and that he would *"keep said offices inactive"* until such time as his legal rights had been resolved and that he was not abandoning the described branch offices.

### The Administrative Proceedings
### Which Preceded the Prior Action.

On or about January 17, 1964, respondent filed with the Board a formal application to transfer a branch office license from its location at 5225 North Figueroa Street, Highland Park, to a new location at Rosecrans and Valley View Avenues, La Mirada, California. On or about March 13, 1964, a statement of issues was filed by the Board alleging that said request for transfer was subject to denial because of lack of statutory authorization for such a transfer. On March 18, 1964, respondent filed a notice of a defense. Following the administrative hearings, the hearing officer issued his proposed decision on December 2, 1964, wherein he set forth his findings of fact.

Among other things the hearing officer found (1) that "[o]n October 1, 1959 and for varying periods thereafter, respondent did, under authority of said Board, operate branch offices at the following locations: . . ." This finding lists 36 office addresses in 29 different California cities and is followed by a finding that "[n]one of said branch offices have been sold by respondent."

The hearing officer stated his determination of issues as follows: "Section 3077(i), Business and Professions Code, authorizes the holding by respondent of the number of branch office licenses for branch offices operated by respondent on October 1, 1959 *and not thereafter sold.* Noth-

ing in said Section or in Sections 3000-3152 of said Code or in any of the Rules or Regulations promulgated pursuant to Section 3025 of said Code restricts the removal of said licenses or otherwise fixes the location thereof as that of October 1, 1959. Respondent's application for the removal of his branch office license from 5225 North Figueroa should be granted." (Italics supplied.)

The proposed order of the hearing officer was as follows: "The application of respondent to remove his branch office license from 5225 North Figueroa is hereby granted." The Board indicated that it would not adopt the decision of the hearing officer but would deny the application.

### The Prior Action

On April 1, 1965, respondent commenced his prior action against the Board by filing in the Superior Court for the County of Los Angeles his "Petition for Issuance of Alternative and Peremptory Writ of Mandate." In this petition respondent alleged that "prior to October 1, 1959, and for varying periods thereafter" he had maintained branch offices for the practice of optometry at locations described in Exhibit 1 thereof. This exhibit listed the same 36 branch office addresses referred to in the findings of the hearing officer as above recited.

It was further alleged that since January 1, 1960, petitioner had filed with the Board requests to transfer certain of his branch office locations but that these requests had been denied on the basis of an arbitrary ruling that branch office location licenses for the practice of optometry were not transferable from one location to another.

Respondent further alleged that in Exhibit 2 of his petition were listed the branch office locations owned by him as of October 1, 1959, as to which he had requested transfers but which the Board had rejected. It is to be noted that of the 30 office locations listed in Exhibit 2, the proposed *relocations* of all but four are described as "to a point within five miles" of a specified address or "to a point within the city limits of [a specified city] or within five miles of [a specified address]."

The prayer of respondent's petition in the former action was as follows: "That an alternative writ of mandate be issued out of this Honorable Court directed to the Board of Optometry of the State of California . . . commanding the said Board, and each of its members, to forthwith grant the application of petitioner to remove his branch office licenses from the branch office locations shown on Exhibit 2 of the within petition for writ of mandate to the relocated locations likewise shown on Exhibit 2 of this petition . . . ."

The Board's answer consisted of a general denial of the allegations of the petition and several affirmative defenses. It affirmatively alleged the actions the Board had taken with respect to each of several other applications for transfers of branch office licenses which respondent Bleeck previously had filed as set forth in Appendix B of the answer. The Board's answer contains the following among other affirmative allegations:

"Respondents further affirmatively allege that, except as to those branch offices set forth in Appendix B attached hereto and fully incorporated herein, petitioner has, on various occasions, merely advised Respondent Board that he was desirous of relocating his branch offices, but petitioner has never filed formal requests to relocate, nor has he ever informed Respondent Board of the addresses to which he proposed to relocate said branch offices; that the proposed general relocations set forth by petitioner on 'Exhibit 2' of his petition were presented to the Board, for the first time, at the Administrative Hearing held on July 21, 1964 and on September 23, 1964, and that petitioner has filed the petition herein before Respondent Board and Respondent Board has had an opportunity to reach a decision on said proposed transfers."

The former action came on for trial in June of 1965. The court took the matter under submission on June 11, 1965. The decision in the first *Rich* case as above recited was filed on July 7, 1965. Five days later, on July 12, 1965, the court signed and filed its memorandum of opinion reciting that "The question of the rights of one occupying the position of petitioner [Bleeck] having been set at rest by *Rich* v. *State Board* . . . decided by the First Appellate District, Division One, on July 7, 1965 . . ." and stating that the court would grant a peremptory writ requiring the Board "to take final action upon the proposed decision and order of [the hearing officer] in accordance with the law as laid down in the *Rich* and *Oakley* cases." Counsel for petitioner were directed to prepare findings, order and writ.

Counsel for respondent thereafter submitted to the court proposed findings of fact, conclusions of law, order and peremptory writ. As indicated by the following quotations therefrom, these forms were so drawn as to constitute an adjudication that Dr. Bleeck had *"the lawful right to seek to and to remove or change the location of each or any of the branch offices listed in Finding of Fact No. IV; that such removal or change of location does not terminate, affect or impair his right and privilege to operate and maintain a branch office at such different location provided the total number of branch offices then being operated by petitioner does not exceed thirty; that the cessation by petitioner of the operation and maintenance of a licensed branch office for the purpose of removing or*

*changing the location thereof to another location did not and does not terminate, affect or impair his right or privilege to obtain and maintain such branch office at a new location and to have such new location licensed as a branch office by the respondent Board upon payment of the fee for such branch office license."* (Italics added.)

Proposed finding of fact No. IV listed all of the 30 branch offices designated in Exhibit 2 of the petition, including the office located at 5225 North Figueroa Street, Highland Park,· which, as we have seen, was the only office involved in the administrative proceeding and in the proposed order of the hearing officer. The other 29 offices are the same offices described in the judgment presently under review.

*The trial court refused to adopt the findings of fact, conclusions of law, order and writ as proposed by counsel for Dr. Bleeck.* On August 18, 1965, the court signed and filed its own drafts of these documents. In so doing the court limited its adjudication to a declaration of Dr. Bleeck's right to the transfer of the license for the branch office at 5225 North Figueroa Street as sought by his application to the Board and as directed by the proposed order of the administrative hearing officer.

The nature and extent of the former adjudication is indicated by the findings of fact, conclusions and order. The findings recite in detail the steps taken in the administrative proceeding which led to the proposed order of the hearing officer and the refusal of the Board to grant the license for the relocation of the branch office specified in that order.

The legal premises upon which the court's decision was based are rather clearly shown by the following quotations from its conclusions of law:

"(1) The respondent Board of Optometry is not authorized or empowered by any provision of the Business and Professions Code of the State of California, or by any other provision of law, to prevent a registered optometrist from relocating and continuing to operate a branch office which he legally had in operation on October 1, 1959 *and which was not thereafter sold by him.*

"(2) The *removal or relocation* of a licensed branch office by a registered optometrist *is not a sale* of such branch office within the purview and meaning of Section 3077(i) of the Business and Professions Code.

"(3) That petitioner is entitled to remove and relocate the branch office at 5225 North Figueroa Street, Highland Park, California, to an appropriate new location." (Italics added.)

The language of the court's order which was carried into the peremptory writ is as follows:

"It Is Ordered that the respondent Board and each of its members shall forthwith act upon the petitioner's application to remove and relocate the branch office hitherto operated by him at 5225 North Figueroa Street, Highland Park, California, and either adopt the recommendation of the Hearing Officer filed with the respondent Board on December 2, 1964, or take such other appropriate and further action thereon as may be consistent with the rules of law covering relocations of existing branch offices as set forth in *Rich* v. *State Board of Optometry* and *Oakley* v. *State Board of Optometry*, reported in 235 A.C.A. 747."

The original file in the former action discloses that on September 23, 1965, the Board filed its return showing that it had complied with the requirements of the writ by granting respondent's application for the relocation of his branch office license for the office located at 5225 North Figueroa Street, Highland Park.

### The Instant Action

On March 2, 1967, respondent commenced the instant action by filing his complaint for declaratory relief seeking a declaration that he was entitled to receive from the Board licenses for the relocation of the remaining 29 of the 30 branch offices referred to in our review of the proceedings in the former action.

When the case came on for trial, the court below agreed with respondent's contention that by reason of the application of the doctrines of res judicata and collateral estoppel, the decision of the trial court in the former action constituted an adjudication that respondent was entitled as a matter of law to receive from the Board licenses to relocate and operate the 29 branch offices here involved. On the basis of this holding the court below granted respondent's motion to exclude any evidence relating to the issues tendered by the allegations of the Board's answer to the effect that respondent had abandoned the branch offices in question in that he had closed them in 1960, 1961 and 1962 in essentially the same manner that the appellant Rich had closed the offices for which he unsuccessfully sought licenses in the second *Rich* case. (*Rich* v. *State Board of Optometry, supra*, 242 Cal.App.2d 598.)

Appellants complain that by this ruling the trial court erroneously rejected their offer of evidence to prove that (1) respondent is not entitled to transfer or relocate said branch office licenses involved herein because respondent is in substantially the same position as was the appellant in

the second *Rich* case; (2) appellant has "abandoned" said branch offices within the meaning of the second *Rich* case; (3) respondent is "not seeking to continue operation" of said branch offices "but rather to start anew" branch office practices in the place of the practices which he "abandoned" primarily in 1960, 1961 and 1962; (4) respondent has ceased doing business at said branch offices, without transferring his practice to other locations, therefore losing "the protection afforded by the 'grandfather clause' of section 3077"; (5) respondent, "by virtue of closing . . . his branch offices, no longer possesses the vested existing interest or competitive advantage which the 'grandfather clause' seeks to protect"; and (6) respondent did not legally or in good faith "evince an intention or desire" to relocate said branch offices, and thus respondent's abandonment of said branch offices results in the loss of the protection of the "grandfather clause" in relation to those branch offices.

On the basis of findings that respondent had not sold any of the 29 branch offices in question and that appellants' defense that respondent had abandoned said offices was foreclosed by the adjudication in the former action, the court entered its judgment ordering the issuance of a peremptory writ of mandate commanding the Board to issue to respondent each and all of the transfers of the described 29 branch office licenses.

*The Trial Court Erred in Its Ruling Based*
*Upon a Misapplication of the Doctrines*
*of Res Judicata and Collateral Estoppel.*

The former action was one in which respondent utilized the statutory remedy of administrative mandamus to obtain a judicial review of the decision of the administrative agency after he had substantially exhausted his administrative remedies. The State Board of Optometry had refused to adopt the proposed decision and order of the administrative hearing officer to the effect that respondent's application for the transfer of one specific branch office license from one specified location to another specified location should be granted.

The decision of the trial court in the former action was rendered only a few days after the filing of the opinion disposing of the appeal in the first *Rich* case and several months *before* the filing of the decision in the second *Rich* case. In view of the language of subdivision (i) of section 3077 of the Business and Professions Code and the language of the decision of the appellate court in the first *Rich* case, the contention that the right to a license to operate a branch office held by an optometrist on October 1, 1959, would be forfeited only in the event of the *sale* of such office was sufficiently reasonable to be more than plausible.

However, the second appellate court decision in *Rich,* in deciding this "first impression" question of statutory construction, makes it entirely clear that the *sale* of a branch office is *not* the only way in which the license to operate such an office can be forfeited. The right to the transfer of a branch office license from one location to another under the facts and circumstances of the first *Rich* case and under essentially the same circumstances found to exist in the first *Bleeck* case very obviously is rested upon a factual and legal foundation very different from that upon which the claims of right unsuccessfully asserted by the optometrist in the second *Rich* case were based. Appellants in the instant case alleged and offered to prove that respondent's licenses to operate the 29 branch offices here involved had been abandoned and terminated by reason of substantially the same set of facts and circumstances which operated to terminate the licenses involved in second *Rich.*

In short, the factual and legal issues tendered in this, the second *Bleeck* case, are different from those decided in the former *Bleeck* case in essentially the same respects as those which differentiated the two *Rich* cases and which led to the opposite results reached in those two cases.

■ The doctrines of res judicata and collateral estoppel dictate generally that a judgment in a prior action between the same parties, even though based upon a different cause of action, " 'operates as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action'. [Citation.]" (*Clark* v. *Lesher,* 46 Cal.2d 874, 880 [299 P.2d 865]; *Todhunter* v. *Smith,* 219 Cal. 690, 695 [28 P.2d 916].) In addition, "the prior determination of an issue is conclusive in a subsequent suit between the same parties as to that issue and every matter which might have been urged to sustain or defeat its determination." (*Pacific Mut. Life Ins. Co.* v. *McConnell,* 44 Cal.2d 715, 724-725 [285 P.2d 636]; *Price* v. *Sixth District Agricultural Assn.,* 201 Cal. 502, 511 [258 P. 387].)

The cited decisions make it clear, however, that the issue itself must have been previously determined in order to foreclose the litigation of such issue in a subsequent action. In other words, a party may not be permitted to introduce new or different evidence to relitigate a factual issue which was presented and determined in a former action. However, the particular legal or factual issue must have been presented and determined in the former action in order for the doctrine to apply.

Witkin points out the essential distinction between issues which *must* have been raised and determined in a prior action in order to invoke the doctrine of collateral estoppel and the *"matters* which might have been

urged to sustain or defeat" the position of a party with respect to such issue as follows:

"Despite the established principle that the estoppel results only on *issues actually litigated,* it is often said that a judgment is binding as to all *matters* which were raised or *which might have been raised.* (See *Price* v. *Sixth Dist. Ag. Assn.* (1927) 201 C. 502, 511, 258 P. 387.) Is this latter statement incorrect as applied to subsequent suits on a different cause of action? The conflict appears to be largely one of expression, and it may be resolved if 'issues' is given a reasonable meaning. Clearly a former judgment is not a collateral estoppel on *issues which might have been raised but were not;* just as clearly it is a collateral estoppel on issues which were raised, *even though some factual matters or legal arguments which could have been presented were not."* (3 Witkin, Cal. Procedure, § 63, p. 1949.)

The decision of the Board presented for judicial review in the former *Bleeck* action involved Dr. Bleeck's right to transfer the license for one *currently operating* branch office from its then present location to another *specified* location. As to this office administrative remedies had been exhausted. The present action, however, involves 29 different branch offices which had been inactive for varying periods of time. Applications for the issuance of licenses to reactivate and operate "substituted" offices at other unspecified addresses were pending before the Board when the instant action was filed.

The permissible scope of the judicial review of the administrative order involved in the former action was necessarily limited to the determination of the issues of law and fact upon which the correctness of that order depended. Judge Whyte, who presided at the trial of the former action, properly rejected respondent's efforts to obtain an adjudication of issues beyond the permissible scope of the former trial.

█ As we have seen, Judge Whyte refused to adopt the findings of fact, conclusions of law and order presented by respondent and by his judgment limited the scope of the adjudication to the issues actually determinative of the correctness of the administrative order presented for his review. █ In these circumstances we invoke the rule that when a court expressly refrains from determining an issue, the doctrine of collateral estoppel does not apply to prevent a subsequent determination of that issue. (*Estate of Doyle,* 202 Cal.App.2d 434, 439 [21 Cal.Rptr. 123].) " '. . . A judgment is not an adjudication as to matters which the court expressly refrains from determining.' [Citations.]" (*Estate of Liddle,* 162 Cal.App.2d 7, 13 [328 P.2d 35].)

The rule also is well settled that if a finding or other determination of an issue in a former action was wholly unnecessary to the judgment, such a finding or determination does not have the effect of a collateral estoppel in a subsequent action. (*Albertson* v. *Raboff*, 46 Cal.2d 375, 385 [295 P.2d 405]; *Natural Soda Products Co.* v. *City of L.A.*, 109 Cal. App.2d 440, 445 [240 P.2d 993]; *Green* v. *Green*, 66 Cal.App.2d 50, 60 [151 P.2d 679].)

In *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control*, 57 Cal.2d 749, 757 [22 Cal.Rptr. 14, 371 P.2d 758], the Supreme Court enunciated another significant limitation upon the application of the doctrine of res judicata. In that case the court declared: "An important qualification of the doctrine of collateral estoppel is set forth in section 70 of the Restatement of Judgments, which reads as follows: 'Where *a question of law* essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; *and in any event it is not conclusive if injustice would result.*' (Italics added.) Comment f to this section explains: 'The determination of a question of law by a judgment in an action is not conclusive between the parties in a subsequent action on a different cause of action, even though both causes of action arose out of the same subject matter or transaction, *if it would be unjust to one of the parties or to third persons to apply one rule of law in subsequent actions between the same parties and to apply a different rule of law between other persons.*' (Italics added.) The conclusion and reasoning of the Restatement find support in *United States* v. *Stone & Downer Co.*, 274 U.S. 225, 235-237 [71 L.Ed. 1013, 47 S.Ct. 616]."

And particularly pertinent to the case at bench is the following observation of the Supreme Court in *Louis Stores, Inc.*, at page 758: "In the present case both of these factors, i.e., public interest and effect upon third persons, strongly indicate that the prior determination of the board should not operate to preclude either the department or the courts from reexamining the statute and applying the correct interpretation (whether or not different from that of the board) to Louis Stores. It is obvious that section 23779 concerns the public interest in an industry requiring close supervision and that it is an important part of an integrated and rather complex licensing and price regulating system. (Cf. *Allied Properties* v. *Department of Alcoholic Beverage Control*, 53 Cal.2d 141, 147-148 [346 P.2d 737].)"

Equally obvious is the fact that section 3077 of the Business and

Professions Code concerns the public interest in a profession requiring close administrative supervision. The grandfather clause of that section has operated to confer upon Dr. Bleeck a distinct competitive advantage over those of his profession who operated no more than one branch office on October 1, 1959, and those who have entered the profession since that date. Moreover, it is manifest that the exemption, to the extent that it is operative, tends to defeat the policy considerations which motivated the Legislature in 1959 when it amended the statute to provide that "no more than one branch office license shall be issued to any optometrist."

Therefore, it is true in this case, as it was in the *Louis Stores* case, that the correct interpretation and application of the pertinent statutory provisions involve matters of very substantial public interest. As we have seen, the judgment favorable to Dr. Bleeck in the former action had become final before the filing of the definitive decision of the Court of Appeal in the second *Rich* case. And as we also have pointed out, it is fairly clear from the record that both the hearing officer and the trial court in the former action understandably but erroneously understood subdivision (i) of section 3077 to mean that an optometrist's right to operate the same number of branch offices that he operated on October 1, 1959, would be forfeited only by *sales* of such branch offices.

The dictates of justice and a due regard for the public interest combine to compel our conclusion that in the case at bench the former adjudication of the *questions of law* involved in the interpretation of section 3077 and of the issues of fact presented in the previous action should not be conclusive in this subsequent action upon different causes of action presenting different legal and factual issues.

### Respondent Failed to Exhaust his Administrative Remedies Before Instituting the Present Action.

The well established doctrine of exhaustion of administrative remedies dictates that before a party may seek judicial review of the decision of an administrative board or officer, he must exhaust all available administrative remedies. Witkin has summarized the California law as follows: "Before a party may obtain judicial review of the decision of an administrative board or officer, he must first apply to such board or officer for relief, and the courts will not act until he has exhausted his administrative remedy. (See *Actions*, § 181.) In California the requirement is jurisdictional. (*Abelleira* v. *Dist. Ct. of Appeal* (1941) 17 C.2d 280, 293, 109 P.2d 942 [prohibition granted to prevent judicial review; 'It is not a matter of judicial discretion, but is a fundamental rule of procedure . . . a juris-

dictional prerequisite to resort to the courts']; *United States* v. *Superior Court* (1941) 19 C.2d 189, 194, 120 P.2d 26 [prohibition granted: 'Jurisdiction to entertain an action for judicial relief is conditioned upon a completion of the administrative procedure']; *Woodard* v. *Broadway Fed. S. & L. Assn.* (1952) 111 C.A.2d 218, 221, 244 P.2d 467 [reversal with directions to dismiss action; 'The doctrine, whenever applicable, requires not merely the initiation of prescribed administrative procedures; it requires pursuing them to their appropriate conclusion and awaiting their final outcome before seeking judicial intervention']; *Anderson* v. *Dept. Alcoholic Bev. Control* (1958) 159 C.A.2d 413, 324 P.2d 24; *People* v. *Coit Ranch* (1962) 204 C.A.2d 52, 57, 21 C.R. 875, citing the text [doctrine can be invoked at any time during trial, even though not previously raised by pleading or in pretrial proceedings]; see 29 Cal.L. Rev. 515.)" (1 Witkin, Cal. Procedure (2d ed. 1970) § 64, p. 587; see also, § 181, pp. 1045-1046 in vol. 2 of the same work and additional decisions there cited.)

■ The doctrine of exhaustion of administrative remedies may not be circumvented by bringing actions other than administrative mandamus such as actions for declaratory relief (*Walker* v. *Munro,* 178 Cal.App.2d 67 [2 Cal.Rptr. 737]), or actions seeking injunctive relief (*Teeter* v. *Los Angeles,* 209 Cal. 685 [290 P. 11]). ■ Judicial intervention is premature until the administrative agency has rendered a final decision on the merits. ■ Before seeking judicial review a party must show that he has made a full presentation to the administrative agency upon all issues of the case and at all prescribed stages of the administrative proceedings. (*Fiscus* v. *Dept. Alcohol Bev. Control,* 155 Cal.App.2d 234, 236 [317 P.2d 993]; *People* v. *Coit Ranch, Inc.,* 204 Cal.App.2d 52, 58 [21 Cal. Rptr. 875].)

■ In the case at bench the record affirmatively shows that respondent did not exhaust his administrative remedies in seeking transfers of the licenses for any of the 29 branch offices involved herein before filing his complaint for declaratory relief.

In view of our conclusions with respect to the determinative issues discussed above, we find it unnecessary to consider or pass upon the merits of appellants' contention that this action is barred by limitations.

The judgment is reversed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied July 15, 1971, and respondent's petition for a hearing by the Supreme Court was denied August 18, 1971.