[L.A. No. 31024. Jan. 31, 1980.]

EVELLE J. YOUNGER, as Attorney General, etc.,
Plaintiff and Appellant, v.
JOHN JENSEN et al., Defendants and Respondents.

**COUNSEL**

Evelle J. Younger, Attorney General, Warren J. Abbott, Robert H. O'Brien, Assistant Attorneys General, and Linda L. Tedeschi, Deputy Attorney General, for Plaintiff and Appellant.

Manatt, Phelps, Rothenberg & Tunney, Manatt, Phelps, Rothenberg, Manley & Tunney, Alan I. Rothenberg, Julia J. Rider, McCutchen, Black, Verleger & Shea, Jack D. Fudge, Michael L. Hickok, Ward L. Benshoof and Robert L. Norris for Defendants and Respondents.

Hughes, Hubbard & Reed, Norbert A. Schlei, Ronald C. Redcay, David A. Lombardero, Otis Pratt Pearsall, John A. Donovan, Philip H. Curtis, Ronald J. Tabak, Kenneth R. Dickerson, James R. Coffee, Don-

ald A. Bright and Edward E. Vaill as Amici Curiae on behalf of Defendants and Respondents.

---

## Opinion

**NEWMAN, J.**—The California Attorney General has appealed from orders that deny two petitions for enforcement of subpenas to give evidence at an investigation into possible antitrust violations affecting California in the marketing of natural gas that originates at Prudhoe Bay, Alaska.

The principal issues are (1) the authorized scope of the state's investigation, and (2) whether federal law preempts the investigation. Also at issue is whether the Attorney General is collaterally estopped by a federal court injunction that on preemptive grounds forbids investigatory proceedings that appear similar.

Government Code section 11180 empowers the Attorney General to investigate any subject under his department's jurisdiction.[1] His power may be delegated to deputies (§ 11182) and includes the right to subpena witnesses and documentary evidence (§ 11181). If a subpena is disobeyed he may petition the superior court for enforcement. (§§ 11186, 11187.) After order to show cause and opportunity for hearing the court must require compliance "[i]f it appears...that the subpena was regularly issued...." (§ 11188.)

On January 19, 1976, the incumbent Attorney General delegated to certain deputies authority "to conduct an investigation into the ownership, production, sale and distribution of Prudhoe Bay, Alaska, natural gas insofar as it affects the State of California, to determine the existence, nature, and scope of violations of the federal and state antitrust laws pertaining to price fixing, monopolization, division of markets, and

---

[1]All section references are to the Government Code unless otherwise indicated. Section 11180 provides: "The head of each department may make investigations and prosecute actions concerning:

"(a)  All matters relating to the business activities and subjects under the jurisdiction of the department.

"(b)  Violations of any law or rule or order of the department.

"(c)  Such other matters as may be provided by law."

The Attorney General is head of the Department of Justice (§ 12510; cf. § 15000), which includes the Office of the Attorney General (§ 15001).

restraint of trade, and to hold hearings, issue subpenas, inspect books and records, take testimony, hear complaints, and administer oaths in connection therewith...." Investigation was prompted by a request of the Public Utilities Commission (PUC) for the Attorney General's opinion on possible antitrust violations arising out of two funding agreements the PUC had approved between certain California utilities and certain producers of Prudhoe Bay gas. Under one agreement Pacific Lighting Gas Development Company (PLGD), an affiliate of Southern California Gas Company, agreed with Atlantic Richfield Company (ARCO) to assume loan payments in exchange for rights to 60 percent of ARCO's gas reserves at Prudhoe Bay. In the other agreement Pacific Gas and Electric Company (PG&E) agreed to assume similar payments in exchange for 30 percent of the Prudhoe Bay gas production of Exxon Corporation over a 20-year period. Both agreements contained "most favored nation" clauses providing that gas should be purchased at prices not less than the highest price paid any producer by any buyer for Prudhoe Bay gas to be delivered in the lower 48 states. PUC's question was whether those clauses would give rise to antitrust violations.

Replying by letter on January 2, 1976, the Attorney General opined not only that the most-favored-nation clauses might be contracts in restraint of trade but also that known facts indicated the need for further investigation of other possible antitrust violations in connection with sales of Alaska gas in California—including price-fixing agreements among producers, monopolization, and division of the California market. The letter urged the PUC to investigate and offered the Attorney General's cooperation.

On December 31, 1975, the Federal Power Commission (FPC)[2] withdrew its authorization to include in gas pipelines' rate bases advance payments made to gas producers. (See *Public Serv. Com'n, State of N. Y.* v. *Federal Power Com.* (D.C.Cir. 1975) 511 F.2d 338 (conditioning the continuation of rate-base treatment of advance payments on further investigation of cost-effectiveness).) The two California funding agreements were then terminated by the parties, whereupon the PUC rescinded its approval of the PLGD-ARCO agreement on January 27, 1976, the PG&E-Exxon agreement on April 13, 1976.

---

[2]As of October 1, 1977, all functions of the FPC were transferred to the Secretary of Energy and the Federal Energy Regulatory Commission. (42 U.S.C. §§ 7151, 7172, 7341; Exec. Order No. 12009, 42 Fed. Reg. 46267 (Sept. 13, 1977), 42 U.S.C.A. § 7341, note.) For convenience here we use "FPC" to refer to the entity exercising those functions after as well as before the transfer.

The Attorney General instituted his investigation in the spring of 1976 by serving subpenas on the four parties to the agreements, requiring that documents be produced and that representatives testify. Responses were deemed inadequate, and accordingly he commenced the enforcement proceedings now before us (§§ 11186-11187)—one against Exxon, the other against PLGD and its secretary, John Jensen.[3] The matter was heard by the trial court, which on April 19, 1977 denied enforcement in both proceedings on the sole ground that the Attorney General's investigation was preempted by federal regulation of interstate distribution of natural gas, particularly under laws conferring jurisdiction on the FPC (see 15 U.S.C. § 717 et seq.). The Attorney General's appeals present identical issues and thus were consolidated.

### AUTHORIZED SCOPE OF INVESTIGATION

The issue posed by the trial court's order is not the validity of hypothetical steps California might take to enforce its antitrust laws but rather the power of the state's chief law officer to investigate possible violation of law. Defendants were subpenaed pursuant to his delegation of authority "to conduct an investigation into the ownership, production, sale and distribution of Prudhoe Bay, Alaska, natural gas insofar as it affects the State of California, to determine the existence, nature, and scope of violations of the federal and state antitrust laws pertaining to price fixing, monopolization, division of markets, and restraint of trade." That clearly was within his over-all authority to investigate "matters relating to...subjects under [his] jurisdiction" (§ 11180; see footnote 1, *ante*, p. 402 and *Shively* v. *Stewart* (1966) 65 Cal.2d 475, 479 [55 Cal.Rptr. 217, 421 P.2d 65, 28 A.L.R.3d 1431]). Possible antitrust violations are, of course, subjects under his jurisdiction. (See, e.g., Bus. & Prof. Code, §§ 16750, 16752-16754.5, 16760.)

Because his investigative power extends to "matters relating to" antitrust violations it does not depend on any predetermination that violations actually or even probably have taken place. The breadth of the power was recognized in *Brovelli* v. *Superior Court* (1961) 56

---

[3] A proceeding against PG&E culminated in an order of the San Francisco Superior Court filed November 22, 1976, which enforced most of the terms of the subpena and is now final. ARCO did not respond to its subpena. Instead it obtained from the United States District Court, Central District of California, an injunction against enforcement that is still on appeal. See *post*, footnote 8. The ARCO proceeding is discussed below in connection with defendants' contention that the present proceedings are barred by collateral estoppel.

Cal.2d 524 [15 Cal.Rptr. 630, 364 P.2d 462], which upheld "an investigation commenced by the attorney general to determine whether the Cartwright Act or the Unfair Practices Act was being violated by the concrete block industry" (*id.*, at p. 526). Noting that mere investigation requires neither the filing of charges nor any formal proceedings, this court stated: "As has been said by the United States Supreme Court, the power to make administrative inquiry is not derived from a judicial function but is more analogous to the power of a grand jury, which does not depend on a case or controversy in order to get evidence but can investigate 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' (*United States* v. *Morton Salt Co.*, 338 U.S. 632, 642-643 [70 S.Ct. 357, 94 L.Ed. 401].)" (56 Cal.2d at p. 529.)

The investigation here could be undertaken to inquire not only into the existence of violations but also into questions of California's jurisdiction over them. (See *Okla. Press Pub. Co.* v. *Walling* (1946) 327 U.S. 186, 215-217 [90 L.Ed. 614, 633-634, 66 S.Ct. 494, 166 A.L.R. 531].) ■ Obviously there is an overlap between coverages of the Sherman Act (15 U.S.C. § 1 et seq.) and state antitrust laws that prohibit substantially the same conduct, such as California's Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).[4] Neither the Sherman Act nor the federal prohibition of undue burdens on interstate commerce (U.S. Const., art. I, § 8, cl. 3) prevents those state laws from reaching transactions that have interstate aspects but significantly affect state interests. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 51 [172 P.2d 867]; *R. E. Spriggs* v. *Adolph Coors Co.* (1974) 37 Cal. App.3d 653, 659 [112 Cal.Rptr. 585].)[5] Accordingly, the coordination of federal and state antitrust enforcement has become a prime example of "cooperative federalism." (Rubin, *Rethinking State Antitrust Enforcement* (1974) 26 U.Fla.L.Rev. 653, 680; see too Mosk, *State Antitrust Enforcement and Coordination with Federal Enforcement* (1962) 21 A.B.A. Antitrust Section 358; Fellmeth & Papageorge, A Treatise on State Antitrust Law and Enforcement (1978) 7-18.)

---

[4]Federal cases interpreting the Sherman Act generally apply to construction of the Cartwright Act. (*Mailand* v. *Burckle* (1978) 20 Cal.3d 367, 376 [143 Cal.Rptr. 1, 572 P.2d 1142]; *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852-853 [94 Cal.Rptr. 785, 484 P.2d 953].)

[5]Cases cited as examples of conflict between state and federal antitrust laws involve statutory differences not present here: *Connell Co.* v. *Plumbers & Steamfitters* (1975) 421 U.S. 616 [44 L.Ed.2d 418, 95 S.Ct. 1830] (though federal antitrust law applies to

■ The present investigation has both interstate and intra-California aspects. Though dealing with gas to be imported from another state, defendants' actions are being investigated for possibly illegal impact on the marketing of that gas in California. Thus while conducting the investigation the Attorney General properly may be concerned not only with the possibilities of prosecution in California courts but also with formulations of enforcement policy in cooperation with federal authorities and with recommendations for remedial administrative rulings and legislation.[6] (See 1 Davis, Administrative Law Treatise (2d ed. 1978) § 4:4.) Section 11180 surely empowers the Attorney General to gather information that is "not plainly incompetent or irrelevant to" those purposes. (See *Endicott Johnson Corp. v. Perkins* (1943) 317 U.S. 501, 509 [87 L.Ed. 424, 429, 63 S.Ct. 339].)

## NATURAL GAS ACT

■ Defendants contend the Attorney General's investigation is preempted by the Natural Gas Act, which gives the FPC regulatory control over rates charged for interstate sale and transportation of natural gas and over the construction, connections, and abandonment of interstate gas pipelines. (15 U.S.C. §§ 717-717w.) ■ The act preempts state laws that would interfere with its regulatory scheme by fixing rates that are under FPC jurisdiction (*Natural Gas Co. v. Panoma Corp.* (1955) 349 U.S. 44 [99 L.Ed. 866, 75 S.Ct. 576] (producer's prices to interstate pipeline); *Public Utilities Comm'n v. Gas Co.* (1943) 317 U.S. 456 [87 L.Ed. 396, 63 S.Ct. 369] (interstate pipeline's prices to local distributor)), by requiring an interstate pipeline to purchase ratably from all connected wellheads (*Northern Gas Co. v. Kansas Comm'n* (1963) 372 U.S. 84 [9 L.Ed.2d 601, 83 S.Ct. 646]), or by ordering extension of an interstate pipeline to a local gas utility (*Illinois Gas Co. v. Public Service Co.* (1942) 314 U.S. 498 [86 L.Ed. 371,

---

contractor's collective bargaining agreement to subcontract only with firms recognizing union, Texas law does not apply because, unlike federal law, it conflicts with federal policies favoring employee organization); cf. *Shell Oil Co. v. Younger* (9th Cir. 1978) 587 F.2d 34 (Bus. & Prof. Code, § 21200, prohibiting motor-fuel price discrimination, not preempted by Sherman or Robinson-Patman acts even though it provides a "meeting competition" defense that is narrower than 15 U.S.C. § 13(b) (Robinson-Patman)).

[6]In questioning the relevance of those concerns to an investigation designed to uncover violations of state antitrust law, the dissenting opinion (*post*, at p. 419) appears to lose sight of (1) the overlap and consequent necessity for coordination of state and federal antitrust enforcement, and (2) the Attorney General's right, on discovering possible violations, not only to invoke existing remedies but also to recommend to legislators and administrators improvement of those remedies or creation of alternate remedies.

62 S.Ct. 384]; cf. *Cabot Corporation* v. *Public Service Com'n of W. Va.* (S.D.W.Va. 1971) 332 F.Supp. 370 (denying state's authority to disapprove transfer of interstate pipeline facilities to entity holding FPC certificate)).

■ The Natural Gas Act does not, however, preclude application of *federal* antitrust laws to interstate gas transactions under FPC regulation. ■ Generally, subsequent federal statutes repeal federal antitrust laws only when there is plain repugnancy, and then only to the extent necessary to make the new statutory scheme work. (*Gordon* v. *New York Stock Exchange* (1975) 422 U.S. 659, 682-683 [45 L.Ed.2d 463, 478-480, 95 S.Ct. 2598]; see *Cantor* v. *Detroit Edison Co.* (1976) 428 U.S. 579, 596 fn. 34 [49 L.Ed.2d 1141, 1152-1153, 96 S.Ct. 3110].) ■ The FPC's power over rates does not preclude federal antitrust proceedings against anticompetitive conduct that affects the rate-making process. The FPC fixes rates by approving or revising those initiated by the regulated companies. (15 U.S.C. §§ 717c, 717d, 717f; *United Gas Co.* v. *Mobile Gas Corp.* (1956) 350 U.S. 332 [100 L.Ed. 373, 76 S.Ct. 373]; *Atlantic Rfg. Co.* v. *Pub. Serv. Comm'n* (1959) 360 U.S. 378, 388-392 [3 L.Ed.2d 1312, 1319-1321, 79 S.Ct. 1246].) Proceedings to prevent or redress anticompetitive agreements or monopolizations that contaminate the private component of the rate-making process do not undercut or impair the regulatory function. (*Georgia* v. *Pennsylvania R. Co.* (1945) 324 U.S. 439, 455-460 [89 L.Ed. 1051, 1061-1064, 65 S.Ct. 716].) Similarly the FPC's control of market allocation through its authority over pipeline interconnections, acquisitions, construction, and abandonment (15 U.S.C. § 717f) does not preclude challenges to that allocation under federal antitrust law. (*California* v. *Fed. Power Comm'n* (1962) 369 U.S. 482 [8 L.Ed.2d 54, 82 S.Ct. 901] (FPC approval of pipeline merger must be stayed pending Justice Department's suit under Clayton Act); *Otter Tail Power Co.* v. *United States* (1973) 410 U.S. 366 [35 L.Ed.2d 359, 93 S.Ct. 1022] (FPC authority to order electric utility interconnections (16 U.S.C. § 824a(c); cf. Natural Gas Act, 15 U.S.C. § 717f(a)) does not preclude Justice Department's Sherman Act suit for monopolistic refusal to supply wholesale electric power).) ■ Though the FPC must take antitrust considerations into account when it determines "public interest" and "public convenience and necessity" (15 U.S.C. § 717f), it has "no power to insulate utilities under its regulation from the operation of the antitrust acts, or to determine when an antitrust violation has taken place. *Otter Tail Power Co.* v. *United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.E.2d 359 (1973)." (*Monsanto Co.* v. *United Gas Pipe Line*

*Company* (D.D.C. 1973) 360 F.Supp. 1054, 1057, affd. (1974) 489 F.2d 1272 [160 App.D.C. 148]; accord, *Northern Natural Gas Co.* v. *Federal Power Comm'n* (1968) 399 F.2d 953, 959-961 [130 App.D.C. 220]; *City of Pittsburgh* v. *Federal Power Commission* (1956) 237 F.2d 741, 754 [99 App.D.C. 113].)

■ Despite the compatibility of the Natural Gas Act with federal antitrust enforcement, defendants here contend that the act precludes the Attorney General's investigating possible violations of California antitrust law. ■ Ordinarily a state's exercise of its police power is not deemed superseded under the supremacy clause (U.S. Const., art. VI, cl. 2) unless "that was the clear and manifest purpose of Congress" (*Rice* v. *Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 1459, 67 S.Ct. 1146]), "compliance with both federal and state regulations is a physical impossibility" (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210]), or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*De Canas* v. *Bica* (1976) 424 U.S. 351, 363 [47 L.Ed.2d 43, 53, 96 S.Ct. 933], quoting *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 587, 61 S.Ct. 399]). (*Ray* v. *Atlantic Richfield Co.* (1978) 435 U.S. 151, 157-158 [55 L.Ed.2d 179, 188, 98 S.Ct. 988].) ■ Defendants do not point out, nor have we found, any words in the Natural Gas Act that expressly prohibit investigation or other activity regarding state antitrust laws that are consistent with the federal counterparts. (Cf. 15 U.S.C. § 717s(a): "The [FPC] may transmit such evidence as may be available...concerning apparent violations of the Federal antitrust laws to the Attorney General....") Nor does there appear any threatening conflict between federal and state antitrust provisions concerning conduct that the present investigation is designed to uncover; namely, "price fixing, monopolization, divisions of markets, and restraint of trade." Hypothetical conflict between federal law and enforcement of California antitrust provisions within the scope of the investigation, even if assumed, is not ground for preemption since it may never arise in fact. (See *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 130 [57 L.Ed.2d 91, 102-103, 98 S.Ct. 2207]; *Goldstein* v. *California* (1973) 412 U.S. 546, 554-555 [37 L.Ed.2d 163, 172-173, 93 S.Ct. 2303]; *Rice* v. *Chicago Board of Trade* (1947) 331 U.S. 247, 255-256 [91 L.Ed. 1468, 1473-1474, 67 S.Ct. 1160].)

Defendants argue that the sweeping and complex character of Natural Gas Act regulation implies congressional intent to exclude state

antitrust enforcement or inquiry. Comprehensiveness and complexity, however, may simply reflect the intricate nature of the regulated subject matter; and no preemptive intent need be implied. (*New York Dept. of Social Services* v. *Dublino* (1973) 413 U.S. 405, 414-415 [37 L.Ed.2d 688, 695-696, 93 S.Ct. 2507].) ■ A federal regulatory act does not preempt harmonious state regulation of matters that only peripherally affect federal concerns. (*De Canas* v. *Bica, supra,* 424 U.S. 351 (Immigration & Nationality Act (8 U.S.C. § 1101 et seq.), being centrally concerned with admission of aliens and treatment of aliens lawfully admitted, does not preempt state law prohibiting employment of illegal entrants); *Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056] (National Labor Relations Act, though prohibiting hiring hall discrimination, does not preclude state tort action for emotional distress caused by outrageous conduct accompanying such discrimination).) ■ Since, as already explained, federal antitrust enforcement seems peripheral rather than central to aims of the Natural Gas Act, no reason appears for deeming the present inquiry into violations of California statutes that harmonize with the federal antitrust laws to be other than peripheral. Therefore there is no preemption.[7]

ALASKA NATURAL GAS TRANSPORTATION ACT (ANGTA)

Defendants also contend that the Attorney General's investigation is preempted by the Alaska Natural Gas Transportation Act (ANGTA),

---

[7]Defendants rely on *Standard Radio & Television Co.* v. *Chronicle Pub. Co.* (1960) 182 Cal.App.2d 293 [6 Cal.Rptr. 246], which barred a Cartwright Act suit that attacked "exclusivity" clauses through which contracts for film distribution to defendant television stations forbade marketing of the same films to other stations, including plaintiff's, within a 60-mile radius. The Court of Appeal concluded that the suit was foreclosed by the FCC's power over such arrangements in connection with its aims to optimize use of broadcast channels (182 Cal.App.2d at pp. 298-300; see *Nat. Broadcasting Co.* v. *U.S.* (1943) 319 U.S. 190, 200-201, 214-220, 222-224 [87 L.Ed. 1344, 1354-1355, 1361-1367, 63 S.Ct. 997]), even though such power would not foreclose a suit to enforce federal antitrust laws (182 Cal.App.2d at pp. 300-301).

That case preceded decisions that limited the preemptive effect of the Federal Communications Act (*Head* v. *New Mexico Board of Examiners in Optometry* (1963) 374 U.S. 424 [10 L.Ed.2d 983, 83 S.Ct. 1759]; see O'Neil, *Television, Tort Law, and Federalism* (1965) 53 Cal.L.Rev. 421, 456-460) and that curtailed federal statutes' preemptive effect on state proceedings peripheral to these statutes' central concerns (*De Canas* v. *Bica, supra,* 424 U.S. 351; *Farmer* v. *United Brotherhood of Carpenters, supra,* 430 U.S. 290). (See too Note, *Federal Preemption in Television Antitrust* (1961) 13 Stan.L.Rev. 629) (criticizing *Standard Radio* even under precedents then available.) *Standard Radio* is disapproved insofar as it holds that a federal regulatory scheme which does not expressly restrict the states and allows enforcement of federal antitrust laws nonetheless may preclude state antitrust enforcement consistent with those laws.

15 U.S.C. sections 719-719o, enacted in October 1976 to facilitate selection, construction, and initial operation of a transportation system for delivery of Alaskan gas to the lower 48 states. The act provides for review and recommendation to the President by the FPC and other agencies (15 U.S.C. §§ 719c-719d), a presidential decision and report to Congress (15 U.S.C. § 719e), and final approval by congressional joint resolution (15 U.S.C. § 719f). That approval was given in November 1977. (Pub.L. No. 95-158, 91 Stat. 1268.) The act limits judicial review by requiring challenges to be filed within limited periods in a particular court and by making the environmental impact statements conclusive (15 U.S.C. § 719h); and those limits are reinforced by declarations of urgency and of intent to exercise fullest congressional power in limiting administrative and judicial procedures (15 U.S.C. §§ 719-719a).

Section 14 of the act (15 U.S.C. § 719*l*) provides, however: "Nothing in this Act, and no action taken hereunder, shall imply or effect an amendment to, or exemption from, any provision of the antitrust laws." Moreover, section 19 (15 U.S.C. § 719 note) directed the United States Attorney General "to conduct a thorough study of the antitrust issues and problems relating to the production and transportation of Alaska natural gas" and to report findings and recommendations to Congress within six months of the act's enactment. That was done. The report recommended (1) the imposition of conditions on the license for the pipeline project, (2) legislation to clarify the pipeline's common carrier status (15 U.S.C. § 719k(a)), and (3) "collateral" actions by the FPC. Based on those recommendations, the President's decision, approved by Congress, requires the licensee to exclude gas producers from participation in ownership of the transportation system and requires parties to sales of gas through the pipeline to submit their sale agreements to the FPC for approval.

We conclude that ANGTA presents no bases for preemption of the present investigation beyond those we have considered and rejected with respect to the Natural Gas Act. ANGTA expressly disclaims amendment of or exemption from federal antitrust laws. (15 U.S.C. § 719*l*.) The pipeline-licensing conditions imposed as a consequence of the United States Attorney General's report do not differ in their relation to federal and state antitrust enforcement from comparable conditions that might be imposed on a pipeline project by the FPC under the Natural Gas Act.

COLLATERAL ESTOPPEL DEFENSE

Defendants contend that the Attorney General is estopped from enforcing the subpenas against them by the federal district court judgment that enjoins him from enforcing a similar subpena against ARCO.[8] The judgment declares that his investigation and the ARCO subpena are "unconstitutional." The court's memorandum of decision that explicates the judgment (see *Tygrett* v. *Washington* (1974) 543 F.2d 840, 844 [177 App.D.C. 355]) concludes that the investigation is preempted by the Natural Gas Act and ANGTA on grounds we have considered and rejected in this opinion.

A federal judgment "has the same effect in the courts of this state as it would have in a federal court." (*Levy* v. *Cohen* (1977) 19 Cal.3d 165, 173 [137 Cal.Rptr. 162, 561 P.2d 252].) Accordingly, the fact that the Attorney General has appealed from the ARCO judgment does not prevent it from operating as a collateral estoppel. (*Calhoun* v. *Franchise Tax Bd.* (1978) 20 Cal.3d 881, 887 [143 Cal.Rptr. 692, 574 P.2d 763]. *Martin* v. *Martin* (1970) 2 Cal.3d 752, 761 [87 Cal.Rptr. 526, 470 P.2d 662].) Moreover, like this court the United States Supreme Court has abandoned the mutuality requirement. (*Parklane Hosiery Co., Inc.* v. *Shore* (1979) 439 U.S. 322 [58 L.Ed.2d 552, 99 S.Ct. 645]; *Blonder-Tongue* v. *University Foundation* (1971) 402 U.S. 313 [28 L.Ed.2d 788, 91 S.Ct. 1434]; *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807 [122 P.2d 892].) The fact that defendants here are not parties to the federal judgment therefore does not preclude its collaterally estopping the Attorney General, who is a party.

Nonetheless the federal judgment does not bar enforcement of the subpenas against defendants because *FPC* v. *Amerada Petroleum Corp.* (1965) 379 U.S. 687 [13 L.Ed.2d 605, 85 S.Ct. 632] is controlling. The Eighth Circuit had held that the FPC had no jurisdiction over intrastate sales of gas commingled in a pipeline with other gas being transported interstate. One ground for the decision was that the FPC was collaterally estopped by the denial of its jurisdiction in an earlier case involving the same parties but different, though legally indistinguishable, sales and pipeline transmission arrangements. Reversing the

---

[8]See footnote 3, *ante*. ARCO was granted a temporary restraining order on June 14, 1976, a preliminary injunction on September 29, 1977, and a summary judgment incorporating a permanent injunction on June 26, 1978. (*Lewis and Atlantic Richfield Co.* v. *Younger et al.*, (C.D. Cal.) Dock. No. CV 76-1890-FW.) Appeal is pending in the Ninth Circuit.

Eighth Circuit, the Supreme Court said: "The Court of Appeals thought that its decision in *North Dakota* v. *Federal Power Comm'n,* 247 F.2d 173, brought collateral estoppel into play in the present case. 334 F.2d 404, 411-412. But that rule has no place here for *no judgment governing past events is in jeopardy, only the scope of future regulation that involves different events and transactions.* See *Commissioner* v. *Sunnen,* 333 U.S. 591, 601-602." (379 U.S. at p. 690 [13 L.Ed.2d at p. 607], italics added.)

Those italicized words apply here.[9] The judgment governs no "past events" but only restricts "the scope of future regulation" by enjoining enforcement of the ARCO subpena. That subpena calls only for evidence under the control of ARCO and thus "involves different events and transactions" from the present subpenas, which demand evidence under defendants' control. The high court's citation of *Commissioner* v. *Sunnen* establishes the existence of that difference notwithstanding the subpenas' common origin in a single investigation. ▇ On the pages cited *Sunnen* says: "[I]f the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency

---

[9]The factual distinction discussed in the dissenting opinion (*post,* at pp. 419-420) does not undercut the applicability here of the quoted words. Though asserted by the FPC the distinction was rejected by the court of appeals, which said: "In our former opinion we fully adjudicated and decided the same issue recurring now under equivalent circumstances that the Commission lacks jurisdiction to regulate gas produced, sold, and consumed intrastate, which is transported in a pipeline commingled with interstate gas and that decision as between these parties bars resurrection of the issue again." (334 F.2d at p. 412.)

When reversing, the Supreme Court majority gave no weight to the asserted distinction and indicated no disagreement with the court of appeals' conclusion that its former opinion "decided the same issue recurring now under equivalent circumstances." The concurring opinion footnote (379 U.S. at p. 691 [13 L.Ed.2d at p. 608]), quoted in the dissent here (*post.,* p. 420, fn. 8), declared that the factual changes "*standing alone,* makes inapplicable any doctrine of collateral estoppel" (italics added) but did not disagree with the majority's broader statement, quoted in our text above, that the doctrine "has no place here" (379 U.S. at p. 690).

in decision is considered just and desirable, reliance may be placed upon the ordinary rule of *stare decisis*. Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. [Citations.]" (Fn. omitted.)

The orders denying enforcement of the subpenas are reversed.

Bird, C. J., Mosk, J., and White, J.,* concurred.

MANUEL, J.—I dissent. It is my view that a sound application of the principles of res judicata, supported by significant considerations of comity between courts of concurrent jurisdiction, precludes the Attorney General from maintaining that the investigation he here seeks to pursue—given the objects which he presently seeks to further through it—is not preempted by federal law. I would affirm the orders appealed from.

I

As the majority opinion indicates, in January 1976, the Attorney General, purporting to act under the provisions of section 11180 et seq. of the Government Code, delegated authority to certain named persons "to conduct an investigation into the ownership, production, sale and distribution of Prudhoe Bay, Alaska, natural gas insofar as it affects the State of California, to determine the existence, nature, and scope of violations of the federal and state antitrust laws pertaining to price fixing, monopolization, division of markets, and restraint of trade, and to hold hearings, issue subpenas, inspect books and records, take testimony, hear complaints and administer oaths in connection therewith, as [the delegates] deem necessary." The following April subpenas to attend and testify and to produce certain described documents were served on respondents Pacific Lighting Gas Development Company (PLGD) and Exxon Corporation (Exxon).[1] Similar subpenas were also served on Pacific Gas and Electric Company (P.G. & E.) and Atlantic Richfield Company (ARCO), who are not parties to the instant action.[2]

---

*Assigned by the Chairperson of the Judicial Council.

[1]The Exxon subpena was actually served on Exxon Company, U.S.A., one of Exxon's operating divisions, but Exxon itself responded.

[2]It does not appear from the record whether other parties as well were served with subpenas in connection with the investigation.

Of the four companies above named Exxon and PLGD, and apparently P.G. & E., responded to the subpenas served upon each of them, but when each failed to comply therewith in a manner and extent satisfactory to the Attorney General the latter commenced separate enforcement proceedings (Gov. Code, § 11187) against them—in San Francisco Superior Court with respect to P.G. & E., and in Los Angeles Superior Court with respect to Exxon and PLGD (the instant proceeding). ARCO, however, did not respond to the subpena served upon it; instead, on the day before the return date set forth therein, it filed an action in the United States District Court for the Central District of California (*Lewis v. Younger,* No. CV 76-1890-FW) seeking declaratory and injunctive relief.

In each of the above four proceedings the substantive issue presented and litigated was the same: Whether the Attorney General's investigation, in light of its purpose and objective, was unconstitutional under the supremacy clause (U.S. Const., art. VI, cl. 2), because it was preempted under the Alaska Natural Gas Transportation Act of 1976 (15 U.S.C. § 719 et seq.), and the Natural Gas Act of 1938 (15 U.S.C. § 717 et seq.).

The first action to proceed to judgment was that involving P.G. & E. (In the Matter of the Investigation of: Ownership, Production, Sale & Distribution of Prudhoe Bay, Alaska Natural Gas, Super. Ct. No. 710-531). On November 22, 1976, the San Francisco Superior Court filed an order substantially enforcing the subpena against P.G. & E. and rejecting all constitutional challenges, including that of preemption. No further review was sought by P.G. & E., and that order is now final.

The instant proceedings against Exxon and PLGD were filed in the Los Angeles Superior Court approximately one month after the order had issued in the San Francisco (P.G. & E.) case. The two petitions were heard jointly, and on April 19, 1977, were denied, the court ruling that the Attorney General's investigation was preempted. The Attorney General's appeals from these orders of denial are the subject of the instant matter.

On June 26, 1978, judgment issued in the federal proceeding which had been brought by ARCO (*Lewis v. Younger, supra,* No. CV 76-1890-FW), plaintiffs having moved for summary judgment on all claims urged by them. The United States District Court (Whelan, dis-

trict judge), declared the Attorney General's investigation unconstitutional and permanently enjoined him from conducting it and from enforcing the subpena directed to ARCO which had been issued pursuant to it.[3]

The Attorney General has appealed from this judgment; his appeal is presently pending before the United States Court of Appeals for the Ninth Circuit (*Lewis* v. *Younger,* No. 773834), oral argument having been heard on June 5, 1979.

## II

The doctrine of res judicata—of which we are here concerned with that aspect known as collateral estoppel[4] or, more modernly, issue preclusion (compare Rest., Judgments, §§ 68-73 with Rest.2d Judgments (Tent. Draft No. 4) §§ 68, 68.1)—"precludes parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction. Any issue necessarily decided in such litigation is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action. [Citations.] The rule is based upon the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue

---

[3]The operative provisions of the federal judgment, of which we may take judicial notice (Evid. Code, §§ 452, subd. (d); 459), are as follows: "IT IS ORDERED, ADJUDGED AND DECREED that Defendants' Investigation of Ownership, Production, Sale and Distribution of Prudhoe Bay, Alaska Natural Gas and Defendants' Subpoena directed to Plaintiffs to Attend, Testify and to Produce Books, Records, Papers and Documents are unconstitutional. [¶] IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants, and each of them, and all persons acting under them or in concert with them, be, and hereby are, *permanently enjoined and restrained* from conducting an Investigation of Plaintiff Company's Ownership, Production, Sale and Distribution of Prudhoe Bay, Alaska Natural Gas and enforcing the Subpoena to Attend, Testify and to Produce Books, Records, Papers and Documents directed to Plaintiffs Howard H. Lewis and Atlantic Richfield Company." (Italics added.)

In its memorandum of decision, filed concurrently with the judgment, the court indicated that its injunction was to be made permanent "[b]ecause of the potential for serious harm such an investigation would have on the federal regulatory scheme." It also stated: "Generally [federal] courts will not enjoin the enforcement of state criminal statutes. 'But this is not an absolute policy and in some circumstances injunctive relief may be appropriate.' *Wooley* v. *Maynard,* 430 U.S. 705, 712 (1977). Such a situation exists in this case; the rule applies to civil cases."

[4]In the words of an influential commentary on the subject, "[c]ollateral estoppel is that aspect of res judicata concerned with the effect of a final judgment on subsequent litigation of a different cause of action involving some of the same issues determined in the initial action." (Note, *Developments in the Law: Res Judicata* (1952) 65 Harv. L.Rev. 818, 840, fn. omitted.)

from again drawing it into controversy. [Citations.]" (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 810-811 [122 P.2d 892].) In light of this underlying policy, we went on to point out in the *Bernhard* case, the criteria to be applied in determining who may *assert* a plea of res judicata differ fundamentally from those to be applied in determining against whom such a plea may be *asserted.* Thus, whereas the requirements of due process of law forbid the assertion of such a plea against a party who was not bound (as a party or a privy to a party) by the earlier litigation, such considerations have no application in determining whether a party to the second proceeding may assert the plea. (19 Cal.2d at pp. 811-813.) The focus, in short, is on the prior adjudication and the status of the party against whom the plea is asserted. The pertinent questions, we concluded, are these: "[1] Was the issue decided in the prior adjudication identical with the one presented in the action in question? [2] Was there a final judgment on the merits? [and 3] Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?" (19 Cal.2d at p. 813.)

I believe that each of these questions must be answered in the affirmative with respect to the assertion of the plea herein against the Attorney General. He, of course, was a party defendant in the case of *Lewis* v. *Younger*, where he had a full opportunity to present his position on the merits. The judgment in that case was on the merits, having been rendered following a motion for summary judgment, and it is final for purposes of res judicata. (*Martin* v. *Martin* (1970) 2 Cal.3d 752, 761-762 [87 Cal.Rptr. 526, 470 P.2d 662];[5] see also *Calhoun* v. *Franchise Tax Bd.* (1978) 20 Cal.3d 881, 887 [143 Cal.Rptr. 692, 574 P.2d 763]; *Levy* v. *Cohen* (1977) 19 Cal.3d 165, 172-173 [137 Cal.Rptr. 162, 561 P.2d 252].) We are therefore left with the question whether the issue decided in *Lewis* v. *Younger* was identical with that presented in the instant case.

Although the judgment of the federal district court in *Lewis* speaks only in terms of its ultimate conclusion—i.e., that the Attorney General's investigation and subpena "are unconstitutional"—we are not limited to that document in determining the scope and content of the issues there presented and determined. It is well established that

---

[5]"A federal court judgment has the same effect in the courts of this state as it would in a federal court. [Citations.] The federal rule is that a judgment or order, once rendered, is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition. (*Stoll* v. *Gottlieb, supra,* 305 U.S. 165, 170. . . .)" (*Martin* v. *Martin, supra,* 2 Cal.3d 752, 761-762, fn. omitted.)

materials extrinsic to the judgment roll, including the memorandum opinion of the trial court, may be used to establish the nature of the issues presented and decided in a former adjudication. (*Carroll* v. *Puritan Leasing Co.* (1978) 77 Cal.App.3d 481, 491 [143 Cal.Rptr. 772]; *Crain* v. *Crain* (1960) 187 Cal.App.2d 825, 831-833 [9 Cal.Rptr. 850]; *Tevis* v. *Beigel* (1957) 156 Cal.App.2d 8, 13-15 [319 P.2d 98]; see generally, 4 Witkin, Cal. Procedure (2d ed. 1971) pp. 3338-3339.) The trial court's memorandum of decision in *Lewis* clearly indicates the nature of the contention and issue before it. "Defendants," the court stated, "concede the Natural Gas Act...preempts *state* regulation of price and transportation of the Alaska natural gas. However, they contend *California* could still regulate agreements or combinations to fix prices, market divisions and contracts in restraint of trade." (Italics added.) Any such regulation, the court concluded, and "an investigation to consider [its] necessity" was preempted by federal law—namely the Alaska Natural Gas Transportation Act of 1976 (15 U.S.C. § 719 et seq.), and the Natural Gas Act of 1938 (15 U.S.C. § 717 et seq.)—because the envisioned regulation (a) "would have the direct effect of regulating price which they [defendants] concede to be preempted" and (b) would "affect [] the interstate commerce of Prudhoe Bay natural gas and the federal regulatory scheme," which is administered by the Federal Energy Regulatory Commission. In this respect the federal district court, quoting from *Northern Gas Co.* v. *Kansas Comm'n* (1963) 372 U.S. 84, at page 91 [9 L.Ed.2d 601, at page 607, 83 S.Ct. 646], noted: "'The federal regulatory scheme leaves no room either for direct *state regulation* of the prices of interstate wholesales of natural gas... or for *state regulations* which would indirectly achieve the same result.'" (Italics added.) Finally, the court decided that the subject investigation must be permanently enjoined "[b]ecause of the potential for serious harm such an investigation would have on the federal regulatory scheme,..."

Looking to the instant proceeding we find that the issues presented are identical to those presented in the federal proceeding. Each of the petitions seeking an order compelling compliance with the subpenas served on defendants provides in essentially identical language: "1. Petitioner is and at all times mentioned herein has been the duly constituted head of the Department of Justice of the State of California. [¶] 2. Petitioner is authorized to take such action as may be necessary *to enforce the California antitrust laws contained in §§ 16700-16758 inclusive of the Business and Professions Code of*

*California.* [¶] 3. Pursuant to the provisions of Government Code §§ 11180 et seq., in January 1976, petitioner instituted an investigation into the ownership, production, sale and distribution of Prudhoe Bay, Alaska Natural Gas insofar as it affects the State of California *to determine whether any of the provisions of the California antitrust laws were being violated.* [¶] 4. Pursuant to the provisions of section 11182 of the Government Code, petitioner authorized [named delegates] of the Department of Justice to conduct the investigation described in paragraph 3 herein....[¶] 5. On [date] a subpoena duces tecum was regularly issued...commanding [named officer of defendant] to appear before [named delegates]...to testify and produce books, records, papers and documents, *which are required in the investigation described in paragraph 3 herein, and will aid said petitioner in determining whether there has been a violation of the California antitrust laws."* (Italics added.) The contentions set forth in appellant's opening brief, which must be considered to further reflect the issues he here seeks to raise, are (1) that "the California natural gas investigation is authorized by California statutes that confer broad investigatory powers on the Attorney General *to investigate possible antitrust violations,* to execute the vital public interest of protecting Californians from unlawful restraints of trade" and (2) that "the Natural Gas Act does not preempt *the Cartwright Act or an investigation thereunder."*[6] (Italics added.) Although this brief goes on to discuss in general terms the breadth of the Attorney General's powers to conduct an investigation under Government Code section 11180 et seq., it is at no point suggested that the instant investigation has any other present purpose than that of developing the informational basis for possible regulation of defendants and others similarly situated under the *California* antitrust laws.[7]

---

[6]The reply brief urges in addition that the Alaska Natural Gas Transportation Act does not preempt the subject investigation and that the investigation involves no violation of the commerce clause, the due process clause, or Fourth Amendment search and seizure protections.

[7]As indicated above, the Attorney General's delegation of authority to investigate pursuant to Government Code section 11182 authorizes the delegates "to conduct an investigation into the ownership, production, sale and distribution of Prudhoe Bay, Alaska, natural gas insofar as it affects the state of California, to determine the existence, nature, and scope of violations of the *federal and state* antitrust laws pertaining to price fixing, monopolization, division of markets, and restraint of trade, and to hold hearings, issue subpenas, inspect books and records, take testimony, hear complaints, and administer oaths in connection therewith, as [the delegates] deem necessary." The Attorney General has at no time suggested that the instant investigation is directed toward the development of an informational basis for possible future action by him under the *federal* antitrust laws. (See generally, *Hawaii* v. *Standard Oil Co.* (1972) 405 U.S. 251, 257-260 [31 L.Ed.2d 184, 189-191, 92 S.Ct. 885]; *In re Multidistrict Vehicle Air*

I am convinced that the majority has ignored the fundamental identity of issues between this case and the prior federal proceeding. It may well be that "the Attorney General properly may be concerned not only with the possibilities of prosecution in California courts but also with formulations of enforcement policy in cooperation with federal authorities and with recommendations for remedial administrative rulings and legislation." (Majority opn., *ante*, at p. 406.) What I fail to understand, however, is the relevance of that consideration to the instant proceeding, where the Attorney General has explicitly indicated that the purpose of his investigation is to uncover any possible violation of *state* antitrust laws.

Nor am I persuaded by the majority's reliance on the case of *FPC* v. *Amerada Petroleum Corp.* (1965) 379 U.S. 687 [13 L.Ed.2d 605, 85 S.Ct. 632], a case cited by none of the parties which in my view is utterly without relevance to the matter before us. There the Federal Power Commission had in 1956 disclaimed jurisdiction over sales of natural gas under certain "firm gas" contracts between a utility company and two affiliated gas producers—holding that such gas, which was produced, wholesaled, transported, and sold intrastate, did not lose its intrastate character, and thus become a proper subject for federal regulation, simply because a part of its transportation occurred in a commingled state with other "dump gas" admittedly being transported in interstate commerce pursuant to other contracts between the same parties. This order had been affirmed. (*State of North Dakota* v. *Federal Power Commission* (8th Cir. 1957) 247 F.2d 173.) In 1960, the two producers entered into new contracts with the same utility company; again these contracts involved intrastate "firm gas," on the one hand, and interstate "dump gas" on the other. This time, however, the gas sold under the "firm gas" contracts was transported intrastate not only with the two producers' interstate "dump gas" but with interstate gas from *another* two producers as well. The commission asserted jurisdiction, holding that commingling the gas sold under the "firm gas" contracts not only with interstate gas of the subject producers but with interstate gas of the two other producers as well justified a different result. The court of appeals, however, set aside the order asserting

*Pollution M.D.L. No. 31* (9th Cir. 1973) 481 F.2d 122, 131.) Nor has he suggested, aside from a passing reference in his opening brief, that other less specific purposes, such as making a report to some appropriate legislative body, such as the United States Congress, was contemplated. As I indicate in more detail below, an investigation having such broad purposes as these would raise questions which, in light of the Attorney General's posture in these proceedings, are not now before us.

jurisdiction, holding that the commission was collaterally estopped from so asserting by its earlier decision and the affirmance thereof. (*Amerada Petroleum Corp.* v. *Federal Power Com'n* (8th Cir. 1964) 334 F.2d 404.)

The Supreme Court reversed, holding insofar as here relevant that collateral estoppel did not preclude assertion of jurisdiction by the commission over the second set of contracts. It was in this context, then, that the court stated that collateral estoppel "has no place here for no judgment governing past events is in jeopardy, only the scope of future regulation that involves *different events and transactions.*" (379 U.S. at p. 690 [13 L.Ed.2d at p. 607], italics added.)[8]

It is clear in my view that the *Amerada* case has no application to the matter before us. We do not deal here with "different events and transactions." We deal with a single investigation and a single legal question: whether that investigation, given its scope and purpose as defined by the Attorney General, is preempted by federal law. The federal district court has determined, in a decision which is final for purposes of res judicata, that it is so preempted. That determination, in my view, precludes the Attorney General from seeking to raise the matter before this court.

### III

The Attorney General goes on to argue, however, that even if the basic requisites for upholding the plea of collateral estoppel here appear, we should nevertheless reject the plea and reach the merits of the issues sought to be presented. First, invoking the doctrine of *Younger* v. *Harris* (1971) 401 U.S. 37 [27 L.Ed.2d 669, 91 S.Ct. 746], he contends that the district court "lacked jurisdiction" to enjoin the subject investigation and therefore that its judgment should not be accorded res

---

[8]The controlling effect of the clear factual differences between the two sets of contracts was made even clearer in a concurring opinion representing the views of three justices. It was there stated: "Some years prior to this action Amerada-Signal claimed no more than its proportionate share, and under those circumstances the FPC disclaimed jurisdiction. See *North Dakota* v. *FPC,* 247 F.2d 173 (C.A. 8th Cir. 1957). The fact that the amount claimed by respondents at the time of this action exceeds Amerada-Signal's proportionate share is due to *the addition of new sources of supply to the commingled stream.* This change, standing alone, makes inapplicable any doctrine of collateral estoppel based on the FPC's disclaimer or the Court of Appeals' affirmance in *North Dakota* v. *FPC, supra.*" (379 U.S. at p. 691, fn.* [13 L.Ed.2d at p. 608, fn. 1]; italics added.)

judicata effect. What this contention fails to recognize, however, is that the doctrine of the cited *Younger* case is not concerned with the lack of subject matter jurisdiction as such but rather with the circumstances in which federal courts, in the interest of federalism, will abstain from asserting their existing equitable jurisdiction to enjoin pending state proceedings, especially of a criminal nature. (See generally, Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief,* 1977 Sup.Ct.Rev. 193.) In any event the high court has recently stated that the *Younger* doctrine does not state "an absolute policy and in some circumstances injunctive relief may be appropriate. 'To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights.' *Spielman Motor Co.* [(1935) 295 U.S.] at 95. . . ." (*Wooley* v. *Maynard* (1977) 430 U.S. 705, 712 [51 L.Ed.2d 752, 761, 97 S.Ct. 1428].) The federal district court in the *Lewis* case, as I have indicated above (fn. 3, *ante*), specifically applied this standard and, in light of what it considered "the potential for serious harm [the subject] investigation would have on the federal regulatory scheme," made its injunction permanent. Even if we disagreed with this assessment, I do not believe that a "lack of jurisdiction" in the former adjudication would thereby appear, necessitating the rejection of PLGD's plea. It should also be noted in this respect that the federal district court undeniably had jurisdiction to grant declaratory relief, which it did grant along with injunctive relief. Thus, even if it appeared that the court somehow lacked "jurisdiction" to grant the latter form of relief, I think it clear that its determination of the issues here in question for declaratory purposes would provide an adequate jurisdictional basis for assertion of the plea of former adjudication.

The Attorney General's final contention is that even if the *Bernhard* requirements for the successful assertion of a plea of res judicata are here met, we should in the exercise of our discretion refuse to uphold the plea because injustice and anomaly would otherwise result. It is pointed out that in circumstances involving multiple enforcement actions against different defendants in which a common question of law is presented, the doctrine of res judicata is normally unavailable to a subsequent defendant following an initial adjudication of that question in favor of a former defendant. (See *Woodford* v. *Municipal Court* (1974) 37 Cal.App.3d 874, 877-878 [112 Cal.Rptr. 773]; *People* v. *Seltzer* (1972) 25 Cal.App.3d Supp. 52, 54-57 [101 Cal.Rptr. 260].) This is so, it has been said, because application of the doctrine in such situations "would produce anomalous results, would not serve the objective of pre-

venting a defendant from being harassed or twice vexed by litigation, and would not accord sufficient consideration to the public interest in the enforcement of [the] laws...." (*People* v. *Seltzer, supra,* 25 Cal. App.3d Supp. at p. 57.) By the same token, the Attorney General argues, to allow PLGD to here raise the plea on the basis of the *Lewis* v. *Younger* decision—without itself being bound by the prior P.G. & E. decision (as to which it was neither a party nor in privity with a party)—would result in an anomalous situation without serving any of the objectives of the doctrine. On the contrary, the Attorney General urges, such a result would fly in the face of "the public interest in enforcement of the antitrust laws and the public interest in the state court determination of the validity of the...subpoenas."

It is quite true that, as we stated in *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 872 [127 Cal.Rptr. 110, 544 P.2d 1310], "[i]n general it may be said that rulings of law, divorced from the specific facts to which they were applied, are not binding under principles of res judicata." The drafters of the Restatement state the same precept as follows: "Where a question of law essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result." (Rest., Judgments, § 70.) It is also quite true that in some cases concerning matters of important public interest the courts will decline to apply the bar of former adjudication even if all of the formal elements for its application are present. (See *Chern* v. *Bank of America, supra,* 15 Cal.3d 866, 872-873; *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 757-759 [22 Cal.Rptr. 14, 371 P.2d 758]; *Kelly* v. *Trans Globe Travel Bureau, Inc.* (1976) 60 Cal.App.3d 195, 202-203 [131 Cal.Rptr. 488]; *Bleeck* v. *State Board of Optometry* (1971) 18 Cal. App.3d 415, 430-431 [95 Cal.Rptr. 860].) In applying these precepts, however, the courts must be alert to the existence of countervailing considerations which, in the circumstances of the particular case, render the upholding of the plea consistent with "sound principles of judicial administration looking to equal justice for all." (*Nevarov* v. *Caldwell* (1958) 161 Cal.App.2d 762, 775 [327 P.2d 111].) In my view such considerations exist in the instant case.

As above indicated, I do not understand the Attorney General to assert that the defendants in the instant case should be bound by the

now-final determination of the San Francisco Superior Court in the P.G. & E. case (In the Matter of the Investigation of: Ownership, Production, Sale & Distribution of Prudhoe Bay, Alaska Natural Gas, Super. Ct. No. 710-531), rejecting the claim of preemption. It is clear that such a claim would fail not only on grounds of due process (see *Bernhard, supra,* 19 Cal.2d at p. 811), but also because it would involve an offensive assertion of the plea. (See *Nevarov* v. *Caldwell, supra,* 161 Cal.App.2d 762; Currie: *Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine* (1957) 9 Stan.L.Rev. 281.) Rather, it is the contention of the Attorney General that, in the words of the Restatement, "injustice would result" if he, being precluded from such an offensive assertion of the plea, were now to be held bound by a defensive assertion based on the contrary decision of the federal district court in the ARCO case, *Lewis* v. *Younger.* I cannot agree. Surely this case bears small resemblance to those such as *Woodford* v. *Municipal Court, supra,* 37 Cal.App.3d 874 and *People* v. *Seltzer, supra,* 25 Cal.App.3d Supp. 52, wherein a criminal acquittal based upon a finding of non-obscenity was sought to be raised as a bar to prosecution by a different criminal defendant in another county. (See also *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901, 907 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707].) The issue here in question is a purely legal one which does not depend for its resolution upon the views of the factfinder to whom it is presented—as is peculiarly the case in obscenity prosecutions. More significantly, whereas a particular finding on the issue of obscenity may depend to a great extent upon the skill and preparation with which a particular prosecutor presents it, here there is no question but that the issue of preemption was argued before the federal district court with all of the skill and vigor which the Attorney General has at his command. In these circumstances, then, I do not believe that the reasoning of the *Woodford* and *Seltzer* cases has any application here.

It is quite true, as the Attorney General so forcefully asserts, that there exists a significant public interest in this state in the full and vigorous enforcement of our antitrust laws, as well as in the pursuance of investigations to that end under Government Code section 11180 et seq. I do not believe, however, that this is a case in which the presence of these considerations should lead us to reject the plea of former adjudication in favor of ourselves addressing the merits of the issues presented. As indicated above (see text accompanying fn. 7, *ante*), the Attorney General does not here seek to test the limits of his investigatory power in areas which the decided cases have not heretofore treated.

Thus he does not assert that his investigation has any purpose other than that of developing an informational basis for regulating the activities of defendants under the *California* antitrust laws, a purpose whose legitimacy is clearly established as within the scope of his investigative power under the California law. (*Brovelli v. Superior Court* (1961) 56 Cal.2d 524 [15 Cal.Rptr. 630, 364 P.2d 462].) No suggestion is made, for instance, that even if an investigation for the indicated purpose should be held to be preempted by federal law, other purposes—such as for instance the development of an informational basis for action under the federal antitrust laws or the presentation of a report to Congress—would remain as legitimate objects of his investigatory powers. While we might, if such contentions were presented, properly take the view that our role as the highest court of this state requires us to reject the plea of res judicata in the interest of delineating further the scope of permissible investigatory powers under Government Code section 11180 et seq., the Attorney General's position herein, in my view, precludes us from doing so in the circumstances of this case.

I would affirm the orders.

Clark, J., and Richardson, J., concurred.

The petition of respondent Exxon Corporation for a rehearing was denied March 13, 1980. Tobriner, J., did not participate therein. White, J.,* participated therein. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.