**STOP & SHOP COMPANIES, INC., Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, Defendant.**

**Civil Action No. 95–12394–PBS.**

United States District Court, D. Massachusetts.

Nov. 19, 1996.

Joseph L. Kociubes, Bingham, Dana & Gould, Boston, MA, Charles S. Treat, Latham & Watkins, San Francisco, CA, for Plaintiff.

Gary J. Valeriano, Anderson, McPaharlin & Conners, Los Angeles, CA, Harry C. Beach, Leonard F. Clarkin, Clarkin, Sawyer & Phillips, P.C., Wellesley, MA, for Federal Insurance Co.

## MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SARIS, District Judge

### INTRODUCTION

Stop & Shop Companies, Inc. ("Stop & Shop") seeks insurance coverage for over 12.5 million dollars in losses diverted by executives of a payroll tax services company from four payments intended for the Internal Revenue Service. Stop & Shop asserts claims for declaratory judgment (Count I), breach of contract (Count II), and breach of the implied covenant of good faith and fair dealing (Count III).

Stop & Shop, a Massachusetts corporation, moves under Fed.R.Civ.P. 56(c) for partial summary judgment on Count I on the ground that a crime insurance policy issued by Federal Insurance Company ("Federal"), an Indiana corporation with its principal place of business in Warren, New Jersey, provides coverage. It asserts, first, that Federal should be barred from relitigating the issue of coverage because the issue has been finally decided against Federal in prior litigation involving similar claims under the exact same policy. In the alternative, Stop & Shop contends that the policy language provides coverage for its losses.

Cross-moving for summary judgment on all counts (Docket No. 11), Federal asserts (1) that the alleged losses are not "direct," as required by the policy's coverage clauses; (2) that Stop & Shop did not own the diverted funds; and (3) that the losses were caused by the wrong-doing of an "authorized representative" of Stop & Shop, and therefore fall within one of the policy's exclusions.

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. After hearing, the Court **ALLOWS** Stop & Shop's motion for partial summary judgment and **DENIES** Federal's cross motion for judgment on the pleadings and summary judgment, except with respect to Count III.

### FACTS

The Court deems admitted the facts of record set forth in Stop & Shop's Motion for

Summary Judgment, which Federal has not contested except as pointed out in the opinion. *See* Massachusetts Rules of Court, Local Rule 56.1. The Court also refers to undisputed facts reflected in related litigation, where relevant. The Bankruptcy Trustee's reports are admissible pursuant to Fed.R.Evid. 803(8)(C) and (24).

### 1. *The Crime Insurance Policy*

On or about February 1, 1990, Stop & Shop purchased a crime insurance policy from Federal which it has maintained at all relevant times. The Premises Coverage clause provides coverage for:

"direct losses caused by the ... disappearance, wrongful abstraction or Computer Theft of Money and Securities within or from the Premises [or] Banking Premises ..."

The Transit Coverage Clause provides coverage for:

"direct losses caused by the actual destruction, disappearance or wrongful abstraction of money and Securities outside the Premises, while being conveyed by the Insured, a partner, or Employee ... or any other person duly authorized by the Insured to have custody thereof ..."

Both the Transit and Premises clauses are subject to an "Authorized Representative" exclusion which provides:

"Coverage under [the Premises Coverage and Transit Coverage Clauses] does not apply to loss or damage ... (B) due to Theft or any other fraudulent, dishonest or criminal act ... by any Employee, director, trustee or *authorized representative* of the Insured whether acting alone or in collusion with others."

(Emphasis added). Security is defined to include negotiable instruments representing money.

### 2. *The Tax Service Agreement*

Sometime in 1987, the S & S Credit Company, a wholly owned subsidiary of Stop & Shop, entered into a Tax Service Agreement ("Agreement") with Hamilton Taft & Company ("Hamilton Taft"). The Agreement provided that S & S, on behalf of Stop & Shop, would deposit funds with Hamilton Taft corresponding to its payroll tax liabilities to various taxing authorities, and provide appropriate payroll data. Stop & Shop's funds were kept in commingled accounts, and were not segregated in any fashion. Hamilton Taft, in turn, would file all related reports and transmit the payments to the appropriate authority in a timely manner. This Agreement was periodically renewed and was in effect at all times relevant to the claims raised. The agreement provided that it should be construed in accordance with the laws of Massachusetts.

### 3. *The Scheme*

In March of 1989 Connie Armstrong had become Hamilton Taft's chief executive officer and its sole director and shareholder. Armstrong, together with certain Hamilton Taft executives, concocted a scheme to divert millions of dollars deposited by clients for the purposes of meeting payroll tax obligations to Armstrong's personal holdings or for his personal use.[1] In a nutshell, after Hamilton Taft employees prepared tax payment checks for transmission to federal tax depositories through regular accounting procedures, those checks in excess of $100,000 were forwarded to the "front office" for duplicate signatures. There, certain top Hamilton Taft executives involved in the scheme manually "lifted" selected checks from the mailing box and caused them to be withheld from the outgoing stream of mailings. These checks had already been entered into Hamilton Taft accounting records as paid, and due to the timing of the withholding and the IRS's verification procedures, the missing payments could go undetected for some five or six months. The client's tax deposits, rather than being sent to taxing authorities, would then be wrongfully appropriated for unauthorized uses.

When the IRS finally made inquiry and demand for a particular payment, or a client

---

**1.** The record indicates that at least at three vice presidents, Steve Lau, Joseph Maitless, and Al May, as well as another executive, Richard A. Fowles, were involved in some aspect of the scheme. App., Tab E, Exh. 2, pp. 20, 49, 50.

became aware that a payment was outstanding, a new check would be prepared and sent to cover the missing payment, plus any penalties accrued, and current payments would be diverted to cover the new check. The original withheld check was then voided. The affected client was told that an accounting snafu had been responsible for the oversight, and that Hamilton Taft had straightened it out. As money was continually diverted in this fashion from client tax payments into Armstrong's pockets, more and more had to be diverted to meet previously unmet payments as the IRS caught on to them, resulting in a ballooning non-payment of client tax obligations.[2]

Unbeknownst to Stop & Shop, Hamilton Taft executives lifted two checks prepared by Hamilton Taft for Stop & Shop payroll taxes due on October 18 and 25, 1990, totalling $5,257,474, in this fashion and never delivered them to the IRS. The payments were finally made on January 31, 1991, and the original checks were voided on February 11. Meanwhile, checks prepared for Stop & Shop payments due January 17 and 24, 1991, totalling $7,632,269, were also "lifted" by Hamilton Taft executives from the stream of payments to the IRS, and never delivered.

On March 8, 1991, Stop & Shop requested that Hamilton Taft provide proof that Stop & Shop was up to date on all payroll tax obligations. Someone at Hamilton Taft immediately issued checks for the missing January payments and sent Stop & Shop the requested proof. *In re Hamilton Taft & Co.*, 53 F.3d 285, 287 (9th Cir.1995). The original checks were then voided.

### 4. *Bankruptcy*

That very day a former Hamilton Taft comptroller had revealed to about 30 of Hamilton Taft's major clients the basic outlines of the diversionary scheme, and it shortly came to light that some $90 million in client tax obligations remained outstanding. At this point, due to the fact that it had caused Hamilton Taft to transmit the unmet January payments to the IRS, Stop & Shop apparently had only about $158,929 in unpaid tax claims against Hamilton Taft. *Id.*

Within two weeks Hamilton Taft creditors had forced the company involuntarily into Chapter 11 Bankruptcy, and on March 26 a Trustee was appointed. Sometime in 1992 the Trustee filed suit against Stop & Shop to recover the January 31 and March 8 payments Hamilton Taft had made on behalf of Stop & Shop as "voidable preferences" under the Bankruptcy Code, 11 U.S.C. § 547(b).[3] Ultimately, the Ninth Circuit held that the payments were preferences within the meaning of the Code, and declared them void. *In re Hamilton Taft*, 53 F.3d at 288–90.[4] Stop & Shop settled with the Trustee for an undisclosed amount. Stop & Shop then brought this action against Federal in federal court in California. Over vigorous opposition from

---

**2.** Federal contests Stop & Shop's statement of material facts with respect to two points: (1) "after the appropriate checks were cut, those checks, totalling in excess of $12.5 million, were stolen from Hamilton Taft," and (2) "prior to Hamilton Taft's bankruptcy, in an effort to cover-up the theft, other funds were diverted and used to pay Stop & Shop's tax liabilities." Based in particular on the Baly affidavit and trustees' reports, the Court concludes these are reasonable inferences from the admissible evidence in the record. Federal has not submitted any evidence to refute these inferences, nor sought discovery to do so.

**3.** The statute allows a bankruptcy trustee to:
... avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;

(4) made—
   (A) on or within 90 days before the date of the filing of the petition ...
11 U.S.C. § 547(b).

**4.** It is not clear from the opinion—and we do not have the memoranda and orders of the bankruptcy and district courts—whether only the $7,632,269 paid on March 8 was held to be void, or whether the Court considered, and ruled upon, the January payments as well. It is clear that in the original suit filed, the Trustee did demand both the January and March payments, but it is possible that the Trustee dropped demand for the January payments at some point during the litigation. The Ninth Circuit opinion only speaks of the March 8 payments. *In re Hamilton Taft*, 53 F.3d at 287. Stop & Shop subsequently settled with the Trustee for an undisclosed amount.

Stop & Shop, the Court allowed Federal's motion for a transfer of venue to Massachusetts pursuant to 28 U.S.C. § 1404(a).[5]

While Stop & Shop was litigating the preference issue with the Trustee, other victims of Armstrong's scheme holding identical crime insurance policies issued by Federal sued in federal court in California to establish coverage of their losses. On cross motions for summary judgment, the federal district court ruled that under California law, the policy provided coverage for losses sustained as a result of Armstrong's thefts, and that because Armstrong himself was not an "authorized representative," the exclusion clause did not apply. *Stanford University Hospital, et al v. Federal Insurance Co.,* No. 93–0563 (N.D.Cal.) (Mar. 23, 1995). Stop & Shop seeks to have preclusive effect given to the result of the *Stanford* litigation in this case.

## DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)), *cert. denied,* —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for

trial.'" *Barbour,* 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36.

### B. Choice of Law

■ A federal district court sitting in diversity must interpret and apply state substantive law. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In determining which state's law to apply, the court is governed by the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). *See Rennick v. O.P.T.I.O.N. Care, Inc.,* 77 F.3d 309, 313 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996). However, where a transfer of venue pursuant to 28 U.S.C. § 1404(a) has been granted, "the transferee court must follow the choice-of-law rules of the transferor court." *Muldoon v. Tropitone Furniture Co.,* 1 F.3d 964, 965 (9th Cir.1993) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964)). In *Van Dusen,* the Supreme Court held that, at least where the defendant seeks the transfer, "[a] change of venue under § 1404(a) generally should be, with respect to state law, but a change in courtrooms." 376 U.S. at 639, 84 S.Ct. at 821. *See also Ferens v. John Deere Co.,* 494 U.S. 516, 519, 110 S.Ct. 1274, 1277–78, 108 L.Ed.2d 443 (1990) (superceded by statute on other grounds). In such cases, "the critical identity to be maintained is between the federal district court which decides the case and the courts of the State in which the

---

5. **s. 1404 Change of Venue**
    (a) For the convenience of parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought.

action was filed." *Van Dusen,* 376 U.S. at 638–39, 84 S.Ct. at 820–21. Because this action was filed in California, California is in effect the "forum state," regardless of the venue change, and this Court therefore must apply choice-of-law principles as the federal court in California would have had no transfer been granted. *Id.* at 639, 84 S.Ct. at 820–21.

■ Where, as here, the parties to a contract have not chosen the law to govern its interpretation, and dispute which of several states' law should apply, California courts employ a "governmental interests" analysis to choose the appropriate law. *Offshore Rental Co., Inc. v. Continental Oil Co.,* 22 Cal.3d 157, 161, 148 Cal.Rptr. 867, 868, 583 P.2d 721, 722 (1978). The court first determines whether more than one state has a "legitimate" interest in having its law and policy effectuated in resolution of the action. *Id.* at 163, 583 P.2d at 725; *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 319, 128 Cal. Rptr. 215, 218, 546 P.2d 719, 722 (1976), *cert. denied* 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (superseded by statute on other grounds). If so, the court must consider whether or not the standards conflict as applied to the parties in the circumstances of the case. *Offshore Rental,* 22 Cal.3d at 162 and 164, 148 Cal.Rptr. at 870 and 872, 583 P.2d at 724 and 726. Where there are conflicting standards, the court should apply the law of the state whose "interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* at 165, 148 Cal.Rptr. at 872, 583 P.2d at 726.

■ Because Stop & Shop is a Massachusetts corporation, and the policy was executed here, California courts would regard Massachusetts as having a strong interest in having its laws applied to the insurance policy at issue in this case. *Compare Clemco Industries v. Commercial Union Ins. Co.,* 665 F.Supp. 816, 818 (N.D.Cal.1987), aff'd, 848 F.2d 1242 (9th Cir.1988) (Table) ("California has a very strong interest in regulating insurance contracts entered into with its own residents in its own jurisdiction and with policing insurance contracts executed in its own jurisdiction.") Although California has a paramount interest in regulating the underlying fraudulent acts said to give rise to coverage under the policy—as those acts allegedly occurred there—that interest is not advanced, or affected in any way, by resolution of whether or not the victim's insurance policy covers the consequent losses. As California's legitimate interests would not be significantly affected by the outcome of this litigation, the Court looks to Massachusetts law to interpret the contract.[6] *Cf. Hurtado v. Superior Court of Sacramento Cty.,* 11 Cal.3d 574, 580, 114 Cal.Rptr. 106, 522 P.2d 666, 670 (1974) ("Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied.")

### C. Collateral Estoppel

Stop & Shop argues that Federal should not have a second opportunity to litigate whether the policy provides coverage for losses sustained by former Hamilton Taft clients as a result of Armstrong's scheme, nor whether Armstrong was an "authorized representative" for purposes of applying the exclusion, because those precise issues were finally and necessarily decided adversely to Federal in prior litigation involving the same insurance policy. *See Stanford, et al. v. Federal,* No. 93–0563 (N.D.Cal.) (Mar. 23, 1995).

■ A federal court in the Ninth Circuit applies the preclusion principles of the state in which it sits. *Costantini v. Trans World Airlines,* 681 F.2d 1199, 1201 (9th Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982). California courts in turn apply federal standards to judgments rendered by federal courts. *Id. See Younger v. Jensen,* 26 Cal.3d 397, 411, 161 Cal.Rptr. 905, 605 P.2d 813 (1980).

■ Offensive collateral estoppel allows a plaintiff who was not a party to a prior action to foreclose a defendant from litigating an issue that it "previously litigated unsuccessfully in an action with another party."

---

**6.** The Court notes that the transferor court came to the same conclusion. (D.App. at tab 2, p. 13, 14.)

*Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 4, 329, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552 (1979). A court may allow collateral estoppel to prevent relitigation of issues that were fully and fairly litigated and necessarily decided in a prior action, but "only when the issues in the subsequent action are identical to those [in] the first action." *United States v. Real Property Located at Sec. 18, Township 23,* 976 F.2d 515, 518 (9th Cir.1992) (citing *Parklane,* 439 U.S. at 326 n. 5, 99 S.Ct. at 649). "Issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same." *Peterson v. Clark Leasing Corp.,* 451 F.2d 1291, 1292 (9th Cir.1971).

■ In the *Stanford* litigation, as here, the court was asked to determine whether a policy identical in all relevant respects to the policy at issue here covered losses plaintiffs claimed they had incurred as a result of Armstrong's fraudulent scheme—indeed some of the same evidence relied upon there has been submitted here. Specifically, the Court in *Stanford* was asked to resolve, among other things, the same two issues presented here: (1) whether plaintiffs' losses were the result of a "wrongful abstraction" within the meaning of the policy, and if so, (2) whether their claims were nonetheless barred by the "authorized representative" exclusion. Because the policy itself does not provide adequate indication of the parties' intent, the Court was required to apply general principles of California law to resolve these issues. Here, because Massachusetts law governs the interpretation of the policy, the Court declines to use the offense collateral estoppel sword against Federal.

### D. Contract Interpretation

Stop & Shop contends it suffered losses due to a "wrongful abstraction" and/or a "Computer Theft" at the hands of Armstrong and his cronies, and that coverage is therefore available under both the Premises and Transit clauses. Federal asserts that Stop & Shop's particular losses are not covered under either clause because (1) they were not a "direct" result of Armstrong's scheme; (2) the misappropriated funds belonged to Ham-

ilton Taft; and (3) the "authorized representative" exclusion bars Stop & Shop's claim.

### 1. Causation

■ Pointing out that the policy covers only "direct losses," Federal contends that Stop & Shop's losses are not directly attributable to Armstrong's fraud because, even if Armstrong had abstracted the checks and tax deposits from Hamilton Taft in the interim, all of Stop & Shop's outstanding tax obligations were eventually paid. According to Federal, Stop & Shop's losses arose only by virtue of the subsequent court ruling in *In re Hamilton Taft* that the payments Hamilton Taft made on March 8, 1991 to cover Stop & Shop's two outstanding tax obligations from the previous January were voidable preferences under the Bankruptcy Code.

The threshold question is the interpretation of the policy term "direct loss." In the insurance context, the Massachusetts courts have construed the term to refer to immediate damage resulting from a covered cause, and to exclude consequential damage caused by an excluded event. *Williams v. Liberty Mut. Fire Ins.,* 334 Mass. 499, 503, 135 N.E.2d 910, 912 (1956) (finding no coverage for "direct loss" where the immediate physical damage resulting from the windstorm [the covered event], was the loss of the shutter, and where the immediate cause of the bursting of the pipe was the freezing weather, in light of express exclusion of losses due to cold weather). *Cf. Hanover New England Ins. Co. v. Smith,* 35 Mass.App.Ct. 417, 421, 621 N.E.2d 382 (1993) (equating the term "directly" with "immediately" and contrasting "ensuing" losses).

Relying on *Peckham v. Continental Cas. Ins. Co.,* 895 F.2d 830, 838 (1st Cir.1990), which discusses causation in a tort context under Massachusetts law, Fidelity argues that "where an independent, intervening event contributes in some unexpected and significant manner to the harm which eventuates, a defendant's conduct cannot be the legal cause of the injury." Fidelity points to two intervening events which it claims break the causal chain of events: (1) the two payments made by Hamilton Taft to the IRS to

rectify Stop & Shop's tax delinquency; and (2) the subsequent court ruling in *In re Hamilton Taft*, declaring these two payments voidable preferences. Although these two events are certainly intervening in a chronological sense, they are not intervening events which defeat legal causation because they did not contribute to Stop & Shop's harm (i.e., the loss arising from the theft of its funds).

True, once Hamilton Taft sent the requisite payments to the IRS to cure Stop & Shop's delinquency, the harm was temporarily rectified. However, when these remedial payments were deemed "void," obligating Stop & Shop to reimburse Hamilton Taft's bankruptcy Trustee for the amounts paid, Hamilton Taft's restitution of Stop & Shop's loss was wiped out. The order and ensuing settlement between the parties effectively returned the state of affairs to the status quo ante March 8, 1991, when Stop & Shop had unquestionably suffered a loss that was directly traceable to Armstrong's heist.

### 2. Ownership of the Funds

■ Next, Federal argues that whatever Armstrong did, no wrongful taking of Stop & Shop's property could have occurred because as soon as Stop & Shop transmitted its funds to Hamilton Taft accounts, they became the property of Hamilton Taft and were no longer Stop & Shop's to lose. Federal relies upon the reasoning in *In re Hamilton Taft* that Stop & Shop's failure to request its funds to be held in trust, or otherwise segregated from the pool of client funds in Hamilton Taft's accounts, meant that Stop & Shop's deposits ceased to be held in trust for the United States and became the property of Hamilton Taft. 53 F.3d at 288. This result was not inevitable even in the bankruptcy context. *See Begier v. Internal Rev. Serv.*, 496 U.S. 53, 67, 110 S.Ct. 2258, 2260, 110 L.Ed.2d 46 (1990) (holding debtor's tax payments held in trust under federal statute in its general non-segregated accounts were transfers of property held in trust and could not be avoided as preferences). Here, however, the determination of coverage hinges on an interpretation of the insurance policy, not bankruptcy law. The policy covers all monies of Stop & Shop abstracted from any person "duly authorized by the Insured to have custody thereof" regardless of whether those monies were commingled with other funds.

Even if Federal's segregation argument had any force it would fail for the simple reason that the tax deposits were misappropriated only *after* Stop & Shop's tax payment checks had been issued by Hamilton Taft on behalf of Stop & Shop, and abstracted by Armstrong. In other words, if there was ever any significance in the fact that the funds were for some time undifferentiated in Hamilton Taft accounts, they were undisputable segregated at the time they were diverted.

### 3. "Authorized Representative" Exclusion.

■ The hardest issue is the interpretation of the exclusion for authorized representatives. The policy excludes coverage for losses "due to Theft or any other fraudulent, dishonest or criminal act ... by any Employee, director, trustee or *authorized representative* of the Insured whether acting alone or in collusion with others." (Emphasis added). "Authorized representative" is not defined.

The exclusion precludes coverage if the wrongful takings by Armstrong as an alter ego or agent of an authorized representative must be imputed to the authorized representative under the policy. Significantly, Federal does not contest Stop & Shop's contention that it amended the Agreement prior to signing to reflect its intent that the agreement could not be assigned to Hamilton Taft's employees. Similarly, Stop & Shop does not contest Federal's assertion that Hamilton Taft was an authorized representative within the meaning of the policy.

This Court does not write on a blank slate in construing the term "authorized representative." In *The Kendall Co. v. National Union Insurance*, No. 93–cv–10501–PBS, this Court was asked to interpret a similar exclusion provision in a policy issued by a different carrier to a Hamilton Taft client company that had also fallen victim to Armstrong's scheme. The policy at issue there excluded "loss due to any fraudulent, dishon-

est or criminal act by an ... authorized representative of any Insured, *while working or otherwise* ..." The question in *Kendall* also boiled down to whether the policy permitted Armstrong's misappropriations of the funds Kendall had transmitted to Hamilton Taft for payroll tax payments to be considered the acts of the corporation, even when those acts were adverse to the interests of the corporation.

This Court concluded that the parties had intended the exclusion to encompass any acts committed by an agent of a corporate authorized representative, even if adverse to the interests of the corporation, based on the phrase, "while working or otherwise" included in the provision. The Court reasoned that by including this phrase, the parties to the policy intended the exclusion to cover fraudulent acts of an agent, regardless of whether the agent was working for, or adversely to, the authorized representative. (Mem.Dec. p. 9). Such express indication of the parties' intent is absent in this case because the Federal policy does not include the "otherwise" language.

Where the intent of the parties cannot be discerned from the ordinary meaning of the language used in the policy and the circumstances surrounding its use, the language is generally considered ambiguous. *Merrimack Valley National Bank v. Baird*, 372 Mass. 721, 724, 363 N.E.2d 688 (1977). The "author of the ambiguous term is held to any reasonable interpretation attributed to that term ... by the other party." *Id. See Massachusetts Bay Transp. Auth. v. Allianz Ins. Co.*, 413 Mass. 473, 477, 597 N.E.2d 439 (1992) ("ordinarily ambiguities in insurance policies are resolved against the insurer") (collecting cases). *Accord Bird v. Centennial Ins. Co.*, 11 F.3d 228, 232 (1st Cir.1993) ("The language of a contract is considered ambiguous only if its terms are fairly susceptible to more than one construction.") (applying Massachusetts law).

Federal argues that Armstrong was Hamilton Taft's alter ego by virtue of the fact that he had complete control of the corporation as its Chief Executive Office, sole shareholder and sole director. In insurance disputes over the meaning of the term "employee" in fideli-

ty bonds, several courts have declined to extend coverage to losses that result from the dishonest or fraudulent activities of dominant shareholders. The key case in this area is *Matter of World Hospitality, Ltd.*, 983 F.2d 650, 652 (5th Cir.1993) (where shareholder controlled 95 percent of the stock and dominated the corporation). Relying on the policy's definition of employee as someone whom the insured has the "right to govern and direct in the performance" of the employee's regular service, the Fifth Circuit reasoned:

All of these courts have recognized that there is a strong policy reason for denying the corporation coverage under the bonds in question. A corporation can only act through its officers and directors. When one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts. Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own fraudulent and dishonest acts. The bonds, however, were clearly designed to insure the corporations against their employee's dishonest acts and not their own acts.

*Id.* at 652.

Using the term alter ego as a "shorthand way of identifying a natural person whom the corporate insured does not have the right to govern and direct in the performance of [his/her] service", the First Circuit similarly rejected the argument that "the theoretical right to govern and direct a dominant corporate actor is sufficient to render that actor an employee." *Bird v. Centennial Ins. Co.*, 11 F.3d 228 (1st Cir.1993) (precluding coverage for the acts of an officer and director who was in complete control of the insured by virtue of his and his wife's stock ownership). The court noted that the alter ego defense was not a common law defense but was derived from the language of the policy, i.e., the "govern and direct" language defining employee. *Id.* at 232 n. 6.

Here, however, *World–Bird* analysis does not control the interpretation of the Federal policy for two reasons. *First,* there is no definition of "authorized representative" akin

to the definition of employee so that the term remains ambiguous in the context of a corporation. While any distinction between Hamilton Taft and Armstrong—its chief executive officer, sole shareholder and director—may seem theoretical, the law recognizes this fiction. "[T]he ownership of all the stock and the absolute control of the affairs of a corporation do not make that corporation and the individual owner identical, in the absence of a fraudulent purpose in the *organization* of the corporation." *Galdi v. Caribbean Sugar Co.,* 327 Mass. 402, 408, 99 N.E.2d 69 (1951) (quotation and citation omitted); *In re Tufts Electronics, Inc.,* 746 F.2d 915, 917 (1st Cir. 1984) (same). Indeed, the course of dealing of the parties reflects their understanding that the corporation rather than its employees was the authorized representative. *Second,* the strong policy considerations articulated in *World* are not applicable here where the victim, not the wrongdoer, would benefit from the receipt of insurance proceeds.

Here, because the dispute hinges wholly on an interpretation of a clause in a contract, not on equitable allocation of risk as between innocent parties, Massachusetts law governing the vicarious liability of a corporation for the wrongs of its agents is not determinative although it provides a useful context. A corporation can act only through its officers, directors and employees. *Commonwealth v. Beneficial Finance Co.,* 360 Mass. 188, 264, 275 N.E.2d 33, *cert. denied,* 407 U.S. 910, 92 S.Ct. 2433, 32 L.Ed.2d 683 (1971). They are "agents" of the corporation with respect to the activities they pursue within their corporate capacity. *Id.* In the context of harm caused to an innocent third party, a corporate principal may be considered responsible for the wrongs of its officers and directors where it has given them

> actual authority to transact *the very business or to do the very act that causes the harm* ... Where the authority is only apparent, vicarious liability recognizes that it is the principal who for his own purposes found it useful to create the impression that the agent acts with his authority, and therefor it is the principal who must bear the burden of the misuse to which that appearance has been put.

*Kansallis Finance Ltd. v. Fern,* 421 Mass. 659, 665, 659 N.E.2d 731, 734 (1996) (Emphasis added). However, the principal is not deemed responsible when "a reasonable third party would not have supposed [the wrongful acts] were taken on the principal's behalf." *Id.,* 659 N.E.2d at 735. Where there is no apparent authority, there may be vicarious liability on the alternative ground requiring an intent to benefit the principal. *Id.* at 669, 659 N.E.2d at 736.

The rationale behind these careful rules governing vicarious liability is concern with equitable allocation, as between innocent principal and innocent third party victim, of the burden of harm caused by the principal's agent. *Id.* at 664, 659 N.E.2d at 734. Massachusetts law makes it clear that in the case of ambiguity in an insurance contract, the economic risk must be borne by the insurer. *See Pinheiro v. Medical Malpractice Joint Underwriting Ass'n of Mass.,* 406 Mass. 288, 294, 547 N.E.2d 49 (1989).

The term "authorized representative" is ambiguous in the context of the theft or abstraction by an agent or officer of an authorized representative who was not acting for the benefit of the corporation (indeed was raiding its assets for personal gains) but who controlled it. One plausible interpretation of the policy—advanced by Stop & Shop—is that it excludes coverage only of thefts by an agent of an authorized representative when he is working within the scope of his duties and for the benefit of the authorized representative but not otherwise. Another equally plausible interpretation—advanced by Federal—is that the corporation, as authorized representative, must be deemed to have ratified the fraudulent actions of Armstrong who as the sole shareholder and director can hardly be said to be ignorant of his own actions. *Inn Foods, Inc. d/b/a U.S. Food Serv. v. Equitable Co-Operative Bank,* 45 F.3d 594, 597 (1st Cir.1995) ("There may be ratification where the principal 'purposely shut[s] his eyes to means of information within his possession and control.'") (citations omitted).

To sum up, the Court concludes the term "authorized representative" is ambiguous for the following four reasons: (1) there is no

definition of the term in the policy and no case law construing the term; (2) other crime insurance contracts have specifically included express terms which exclude coverage where an agent was not working for the benefit of the principal and within the scope of his authority; (3) the course of conduct of these parties in amending the Agreement suggested that they specifically intended that the authorized representative be Hamilton Taft, not Armstrong; and (4) there is no suggestion that a corporate alter ego would benefit from his wrongdoing so as to preclude coverage for the public policy reasons articulated in the *World–Bird* line of cases. Resolving the ambiguity in the exclusion in favor of the insured, the Court therefore finds that the policy exclusion does not preclude coverage under the transit and premises clause.

### E. Coverage

The remainder of the analysis is relatively straightforward and consistent with the conclusions in the *Stanford* case. The undisputed facts in the record support the following reasonable inferences. While the payroll tax checks (which fall within the policy definition of security) were being conveyed by the authorized representative to the taxing authorities, they were wrongfully abstracted by Armstrong acting in collusion with other Hamilton Taft executives who lifted them out of the mailboxes. These wrongdoers abstracted the funds sent by Stop & Shop as tax deposits to cover its payroll tax obligations, by means of computer, from the banking premises of the authorized representative for unauthorized purposes. These events are covered under both the premises and transit clauses.

### F. Remaining Counts

The Court *DENIES* Federal's motion to dismiss the claim of breach of contract (Count II), but finds no bad faith on the part of Federal.[7] This was a tough case. In light of the complexity of the issue and this Court's earlier decision on a different, but analogous policy, it was not unreasonable for Federal to take the position that its policy did not provide coverage in this case. Moreover, to the extent Stop & Shop claims that

Federal in bad faith declined payment for lack of timeliness in making a claim, it has alleged no damage flowing from this breach. Federal has apparently waived this argument as it is not asserted as a basis for its motion for judgment on the pleadings or for summary judgment. Accordingly, the Court dismisses the claim for the breach of the implied duty of good faith and fair dealing. (Count III).

### ORDER

For the foregoing reasons it is hereby *ORDERED*:

1. Plaintiff's Motion for Partial Summary Judgment on Count I (declaratory judgment) (Docket No. 11) is *ALLOWED.*

2. Defendant's Cross Motion for Summary Judgment (Docket No. 17) is *DENIED.*

3. Defendant's motion for judgment on the pleadings (Docket No. 12) is *ALLOWED* with respect to the claim of bad faith (Count III) but is otherwise *DENIED.*

4. After conferring with defendant, plaintiff shall submit an affidavit within ten (10) working days with a dollar amount of its "direct loss" and a form of judgment. If the dollar amount is disputed, defendant shall submit an affidavit and memorandum within ten (10) days thereafter to explain why the dollar amount is contested.

---

7. There is no claim asserted under Mass.Gen.L. ch. 93A or 176D.